UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| **CHRISTA GAIL PIKE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 1:12-CV-35** |
| **v.** | ) | |
| | ) | **DEATH PENALTY CASE** |
| **JORDAN CLARK, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**THIS IS A CAPITAL CASE.**
**MS. PIKE IS SCHEDULED TO BE EXECUTED**
**SEPTEMBER 30, 2026 at 10:00 a.m. CDT**

# MOTION TO REOPEN JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(b)

COMES NOW the Petitioner in the above-styled case and hereby respectfully moves this Court to reopen the judgment in this case pursuant to Fed. R. Civ. P. 60(b)(6).

## I. INTRODUCTION

This is an extraordinary case. On August 13, 2026, the State of Tennessee conceded for the first time in thirty years that Ms. Christa Pike had been the victim of child sexual abuse and rape, stating: "The State does not dispute the terrible things that Ms. Pike suffered. I think everybody in this courtroom wishes that those things had never happened to Ms. Pike. I think we all wish that we were not here today and that she was not on death row…. And so it's certainly not the State's intention to try to minimize the suffering that Ms. Pike has experienced." Expedited Transcript of

the Evidence at 82–83, *Tennessee v. Pike*, No. M2020-01156-SC-DPE-DD (Tenn. Aug. 13, 2026). This is the first time in the history of Ms. Pike's case that the State has conceded her history of child sexual abuse and rape. Indeed, the State called Ms. Pike a "pathological liar" in earlier proceedings in this case, 1 Transcript of the Evidence at 300, *Pike v. Tennessee*, No. 68280 (Tenn. Crim. App. Apr. 25, 2011) [hereinafter "PC Tr."], and argued that she had fabricated her account of rape by Claude Davis. *Id*. at 305-311.

The State's recent concession is diametrically opposed to the arguments it put forward in prior proceedings—arguments that directly contributed to this court's decision to reject Ms. Pike's ineffective assistance of counsel claim. Combined with the documentary evidence and reports on the nature, consequences, and impact of the gender-based violence experienced by Ms. Pike, the State's concession erodes the foundation of the state post-conviction court's 2008 judgment rejecting her ineffective assistance of counsel claim, as well the opinions of the Tennessee Court of Criminal Appeals and Tennessee Supreme Court that relied upon those findings. It also vitiates the decision of this Court to deny her ineffective assistance of counsel challenge, the affirmance by the Court of Appeals for the Sixth Circuit, and the decision by the U.S. Supreme Court to deny certiorari.

For the reasons set forth below, Ms. Pike respectfully moves this Court to grant relief under Rule 60(b)(6) and reopen its judgment denying habeas relief.

## II. RELEVANT FACTUAL AND PROCEDURAL HISTORY

### A. Procedural History

In 1996, a jury convicted Ms. Pike of first-degree murder and sentenced her to death. *State v. Pike*, 978 S.W.2d 904, 913-14 (Tenn. 1998). The Supreme Court of Tennessee at Nashville affirmed her conviction and sentence on direct appeal. *Id*. at 914. Ms. Pike sought post-conviction

relief on the grounds, *inter alia*, that her trial and appellate counsel were ineffective because of their failure to present readily available information about Ms. Pike's history of abuse and neglect, including her childhood sexual abuse and rapes. Appellant's Merits Brief to Tennessee Criminal Court of Appeals, at 37-39, 93, 105-6, *Pike v. Tennessee*, E2009-00016-CCA-R3-PD (Tenn. Crim. App. Sept. 28, 2009).

The post-conviction court rejected Ms. Pike's claim of ineffective assistance of trial and appellate counsel. Findings of Fact and Conclusions of Law, *Pike v. Tennessee*, No. 68280, at 76, 89-91 (Knox Cnty. Crim. Ct. Dec. 10, 2008). As detailed below, the court discredited Ms. Pike's history of repeated, severe child sexual abuse and rape after the state repeatedly called Ms. Pike a "pathological liar" and suggested that she was making up her history of sexual abuse and rape. The Tennessee Court of Criminal Appeals affirmed the denial of state post-conviction relief, *Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *1 (Tenn. Crim. App. Apr. 25, 2011), *cert. denied*, 568 U.S. 827 (2012), based on the post-conviction court's findings.

This Court denied relief, *Pike v. Freeman,* No. 1:12-CV-35, 2016 WL 1050717 (E.D. Tenn. Mar. 11, 2016), and the United States Court of Appeals for the Sixth Circuit affirmed. *Pike v. Gross*, 936 F.3d 372, 374-75 (6th Cir. 2019), *cert. denied*, 590 U.S. 978 (2020). In adjudicating Ms. Pike's ineffective assistance of counsel claim, this Court presumed the correctness of the state court's decision and found that it was neither contrary to nor involved an unreasonable application of federal law. *See Pike v. Freeman*, 2016 WL 1050717 at **9, 15; 28 U.S.C. §§ 2254(d); 2254(e)(1).

On September 30, 2025, the Tennessee Supreme Court issued an order setting Ms. Pike's execution for September 30, 2026. Order, *State v. Pike*, No. M2020-01156-SC-DPE-DD (Tenn. Sept. 30, 2025).

On June 12, 2026, Ms. Pike filed a "Motion and Request to Appoint a Special Master Pursuant to Tenn. Sup. Ct. R. 12(4)(E)," raising facial and as-applied challenges to Tennessee's lethal injection protocol. The Tennessee Supreme Court appointed a special master to conduct an evidentiary hearing and make findings of fact and conclusions of law on five specified issues. Order, *State v. Pike*, No. M2020-01156-SC-DPE-DD (Tenn. July 10, 2026). At the conclusion of the two and a half days' hearing, the State made an extraordinary admission conceding for the first time that Ms. Pike has been the victim of childhood sexual abuse and rape. Expedited Transcript of the Evidence at 82–83, *Tennessee v. Pike*, No. M2020-01156-SC-DPE-DD (Tenn. Aug. 13, 2026).

The special master issued his report on August 20, 2026. After Ms. Pike filed objections to the report on August 27, 2026, the parties submitted briefing on the remaining issues. Despite the State's concession, on September 23, 2026, the Tennessee Supreme Court denied Ms. Pike a stay of execution because it concluded she is unlikely to succeed on her facial and as-applied challenges to the lethal injection protocol. Order, *Tennessee v. Pike*, No. M2020-01156-SC-DPE-DD (Tenn. September 23, 2026). Ms. Pike filed a petition for certiorari in the United States Supreme Court seeking review of the Tennessee's Supreme Court's decision. Petition for writ of certiorari, *Pike v. Tennessee*, No. 26-5696 (U.S. Supreme Court Sept. 25, 2026).

### B. Factual History

#### 1. The State of Tennessee Now Concedes the Following Facts Regarding Ms. Pike's History of Child Sexual Abuse and Rape.

From August 11–13, 2026, a Special Master appointed by this Court pursuant to Rule 12 held an evidentiary hearing about the state's lethal injection protocols as applied to Ms. Pike. During the hearing, the Special Master heard testimony and received reports from Dr. Bethany Brand, an expert on the traumatic impact of sexual violence and adverse childhood experiences.

*See* R. 12 Tr. Vol. 4 (Aug. 12, 2026); Exs. 16 (Forensic Psychological Evaluation, July 29, 2023), 17 (Addendum Report, June 1, 2026), and 18 (Second Addendum, August 4, 2026). Dr. Brand's testimony, report, and addenda established the following facts.

Dr. Brand testified that rape and sexual abuse pervaded Christa's childhood and adolescence. By the time she was seventeen, Christa had been raped by four different men and sexually abused by another. R. 12 Tr. Vol. 4 at 324–26, 330, 335; Ex. 16 at 23. These men eroded her sense of safety and irrevocably damaged her mental health. Ex. 16 at 22, 28, 35.

Christa was just a toddler when her paternal grandmother's boyfriend, Ernest Johnson, sexually assaulted her for the first time. R. 12 Tr. Vol. 4 at 324. His sexual abuse continued for years, escalating to oral rape when she was in preschool. *Id.* He ensured Christa's silence by threatening to kill her beloved pets and her grandmother. *Id.* He once thrust her into a chicken coop, locked the door, and left her huddled in the dark while spiders crawled over her skin and bit her. *Id.*; Ex. 16 at 10.

To her child's eyes, Ernest's genitalia seemed monstrous. In elementary school, a teacher asked the children to draw what they did at home. Christa drew a man with "a huge penis and demon face." Ex. 16 at 10. Alarmed, Christa's teachers took her to the principal and called her parents, but no one investigated further.[1] *Id.*; R. 12 Tr. Vol. 4 at 325. To this day, Christa can recall the smell of Ernest Johnson's genitalia. *Id.* at 330. At the hearing, Dr. Brand described the significance of this sensory memory:

> I actually saw with my own eyes that she dissociates to this day because of the earlier traumas. I also saw signs of disgust when I asked about trauma exposure.

[1] Christa's drawing was a red flag signaling sexual abuse. Today, Tennessee trains mandatory reporters—including teachers—that children who are preoccupied by sexually explicit images may be experiencing sexual abuse at home. *See* Tenn. Dpt. of Children's Services, Mandated Reporter Training Video, at 5:03 (available at https://www.tn.gov/dcs/program-areas/training/cw-resources/mandated-reporter-training.html).

> She told me about what Ernest did, and trauma memories are different than regular memories. They present with sensory intensity and fragments. So as she talked about what Ernest did to her as a very little girl, she didn't tell me the whole coherent story. Instead she showed a disgust response, like I--I'm imitating it. She said, "I can still smell his genitals." And she had this look of utter disgust on her face. That is demonstrated PTSD reactivity and the intrusiveness of the sensory memory of trauma.

*Id.* at 330–31.

At age 11, Christa was in fifth grade at Carrboro Elementary School. On November 3, 1987, the school bus dropped Christa off near her mother's home. When Christa arrived, her mother was at work and the house was empty. McCoy Social History Vol. 1, *Tennessee v. Pike* 7472, 7479, No. 68280, Knox Cnty. Crim. Ct. (2007); Exhibit 5 (Claude Davis Criminal Court records), *Pike v. Tennessee*, No. 68280, Knox Cnty. Crim. Ct. (2007) [hereinafter "PC Tr. Exhibit 5"]. As she was walking to the mailbox, a 37-year-old neighbor named Claude Davis grabbed her, held her down, and raped her. Ex. 16 at 12; PC Tr. Exhibit 5. Davis was arrested and eventually pleaded "no contest" to "assault on a child under twelve years of age." PC Tr. Exhibit 5. He received a sentence of two years' imprisonment, which was suspended for a term of five years. *Id.* After the rape, Christa was afraid and hypervigilant. "I thought he'd get me again," Christa told Dr. Brand. Ex. 16 at 12.

At the time Davis raped her, Christa was already struggling with the consequences of long-term sexual abuse by Ernest Johnson. She had developed a series of behavioral issues that all experts today would recognize as symptomatic of such abuse. She wet the bed every night until she was in first grade. Ex. 16 at 8. She had trouble concentrating in school and began acting out.[2] *Id.* at 14.

---

[2] This is commonplace in survivors of childhood sexual abuse, which—as Supreme Court Justice Samuel Alito recognized—is "grossly intrusive in the lives of children." *Kennedy v. Louisiana*, 554 U.S. 407, 468 (2008) (Alito, J., dissenting) (citation modified). The U.S. Department of Health and Human Services explains: "Abused and neglected children sometimes get the reputation for

After she was raped by Davis, her symptoms worsened. Christa began to regularly use marijuana and alcohol to numb her feelings of despair. *Id.* at 13. She began cutting herself. *Id.* She attempted suicide. *Id.* at 14.[3] By late adolescence, she was running away from home for extended periods and was occasionally living on the streets.[4] Ex. 16 at 16.

On January 14, 1994, Christa was walking to the store at night, alone, when she was grabbed by a stranger, thrown to the ground, and raped. Ex. 16 at 17; Ex. 17 (Brand Addendum) at 225A; Ex. 19 (Carrboro Police records); Ex. 20 (Univ. of North Carolina Hospital Records). She was 17 years old. Ex. 16 at 17; Ex. 17 at 225A. Christa fought him as hard as she could. Ex. 16 at 17. He tore her clothes off and forced himself on her so violently that he bruised and scraped her entire body. Ex. 20; Ex. 17 at 225A–226A. As he was raping her, Christa managed to escape. Ex. 16 at 17. Christa immediately went to a friend's house, who called the police and took her to a hospital, where the staff collected a rape kit and documented bruising on Christa's upper inner thigh and abrasions on her chest and knee. Ex. 17 at 225A; Ex. 20. Weeping and hysterical, she

being 'bad kids' or extremely difficult to control or understand. Research suggests that challenging behavior is often a cry for help that concerned adults need to learn to decode." Health & Hum. Serv., *The Role of Educators in Preventing and Responding to Child Abuse and Neglect* 13 (2003), https://www.icmec.org/wp-content/uploads/2015/10/Role-of-EducatorsPrevention-Booklet-US.pdf.

[3] Tennessee's Department of Children's Services teaches mandatory reporters that suicidal ideation and self-injury/cutting are symptoms of sexual abuse in children. *See* Tenn. Dpt. of Children's Services, Mandated Reporter Training Video, *supra* note 1, at 5:09.

[4] Experts have long observed that abused children are apt to engage in "risky behaviors." Paradoxically, these symptoms of abuse leave them vulnerable to repeated victimization. Moreover, research has shown that "sexual violence [is] a risk for girls throughout their lives, though particularly during adolescence." Human Rights Project for Girls, *The Sexual Abuse to Prison Pipeline: The Girls' Story* 9 (2015), https://genderjusticeandopportunity.georgetown.edu/report/the-sexualabuse-to-prison-pipeline-the-girls-story/ (citation omitted).

told the police what happened, but the perpetrator was never identified or caught. *Id.*; Ex. 20 (noting that Ms. Pike was "[t]earful, very upset while telling story").

The State did not contest this evidence during the hearing. After the testimony concluded, the State expressed sympathy and concern for Ms. Pike and stated unequivocally that it "does not dispute the terrible things that Ms. Pike suffered." R. 12 Tr. Vol. 1 at 82–83 (Aug. 13, 2026). As detailed below, this concession is a marked departure from the litigation position taken by the state during state post-conviction proceedings.

**SUMMARY OF ARGUMENT**

Ms. Pike's death sentence is the product of the following series of extraordinary events:

1. Ms. Pike's attorney failed to present *any* evidence of Ms. Pike's childhood sexual abuse and rapes during the sentencing phase of her trial proceedings. Before she was eighteen, she would be violently raped by three different men. Two of the three rapes are documented by record evidence.

2. In state post-conviction proceedings, the state vigorously contested Ms. Pike's documented history of sexual violence, calling her a "pathological liar," characterizing her as a sexually promiscuous teenager, and repeatedly suggesting that she either invented or invited the rapes she experienced.

3. The post-conviction court embraced the state's characterization of Ms. Pike's childhood sexual abuse and rapes when making its factual determinations, dismissing the conclusions of mental health experts because their opinions were based on what Ms. Pike told them, erroneously finding that a perpetrator of one rape was "arrested but not convicted," highlighting that Ms. Pike was "promiscuous," and describing information about Ms. Pike's

childhood sexual abuse as "problematic" because her family members did not believe her. These arguments invoked now-debunked notions about sexual assault victims.

4. These factual findings formed the basis for the post-conviction court's unreasonable legal conclusion that Ms. Pike had failed to establish a violation of *Strickland v. Washington,* 466 U.S. 668 (1984). The post-conviction court unreasonably concluded that the evidence of Ms. Pike's rapes was double-edged, and that trial counsel's decision not to present the evidence was not reasonable.

5. Ms. Pike then raised her ineffective assistance of counsel claims in her federal habeas proceedings. The Supreme Court and the Sixth Circuit have held that the failure to present evidence of child sexual abuse and rape constitutes ineffective assistance counsel. *See Wiggins v. Smith,* 539 U.S. 510, 535 (2003) (finding counsel ineffective for failing to present "powerful" mitigating evidence of "sexual molestation" and "repeated rape"); *Foust v. Houk*, 655 F.3d 524, 543 & n.9 (6th Cir. 2011) (finding that trial counsel was ineffective for failing to present evidence of child sexual abuse in home and that such evidence was not cumulative). This Court, however, deferred to the unreasonable findings of the post-conviction court that were tainted by the state's (now abandoned) litigation posture.

6. In rejecting Ms. Pike's ineffective assistance of counsel claim, this Court further held that evidence adduced during the state post-conviction hearing—including the documented evidence of her child sexual abuse and rape—was cumulative of evidence presented during trial. *Pike v. Freeman*, 2016 WL 1050717 at *15. Yet in *Foust*, the Sixth Circuit held that evidence of sexual abuse in the home—even in the case of a defendant who was not a direct victim of such abuse—was not cumulative of other mitigating evidence. 655 F.3d at 543 & n.9.

7. On August 13, 2026, the state for the first time conceded that Ms. Pike had been the victim of childhood sexual abuse and rapes, stating unequivocally that "[t]he State does not dispute the terrible things that Ms. Pike suffered" and "it's certainly not the State's intention to try to minimize the suffering that Ms. Pike has experienced."

8. As a result of the State's invocation of false and gendered tropes during state post-conviction proceedings, buttressed by the post-conviction court's misreading of documentary evidence, no court has fairly considered the import of trial counsel's failure to present Ms. Pike's history of extreme sexual violence to the jury. As a result, the courts have upheld her death sentence notwithstanding the clear directives of the Supreme Court and the Sixth Circuit in *Wiggins* and *Foust.* Executing Ms. Pike in the absence of such review would be a grave and irreparable miscarriage of justice.

## II. FED. R. CIV.P. 60(b) IS THE APPROPRIATE PROCEDURAL MECHANISM FOR THE LITIGATION OF MS. PIKE'S CLAIM

### A. Ms. Pike's Motion Asserts a Defect in the Integrity of the Federal Habeas Proceeding.

District courts have jurisdiction to consider Rule 60(b) motions in habeas proceedings when such motions "attack[ ] not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceeding." *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005). In this motion, Petitioner asks the Court to reopen and set aside its earlier judgment based on the State's now-abandoned litigation posture, a posture that tainted the integrity of the state court record that undergirds this Court's judgment.

Rule 60(b)(6) allows a party to seek relief "from a final judgment, order, or proceeding" and request reopening of a case for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). This Rule "vests power in courts … to enable them to vacate judgments whenever such action is

appropriate to accomplish justice." *Klapprott v. United States*, 335 U.S. 601, 615 (1949); *see also Henness v. Bagley*, 766 F.3d 550, 554 (6th Cir. 2014) ("'The decision to grant Rule 60(b)(6) relief is a case-by-case inquiry that requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts.'" (*quoting McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 750 (6th Cir.2013), cert. denied, 571 U.S. 1161 (2014)). Indeed, Rule 60(b)(6) "reflects and confirms the courts' own inherent and discretionary power, 'firmly established in English practice long before the foundation of our Republic,' to set aside a judgment whose enforcement would work inequity." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 233-34 (1995) (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944)); *see also Tanner v. Yukins*, 776 F.3d 434, 438 (6th Cir. 2015); *Johnson v. Bell*, 605 F.3d 333, 336 (6th Cir. 2010) (stating that Rule 60(b) "is inherently equitable in nature," and "empowers district courts to revise judgments when necessary to ensure their integrity").

Ms. Pike's Rule 60(b)(6) motion meets this jurisdictional prerequisite. In her state post-conviction petition, Ms. Pike alleged that her trial counsel was ineffective for failing to present extensive mitigating evidence, including documented evidence of Ms. Pike's prior rapes. Under 28 U.S.C. § 2254(e)(1), federal courts must defer to state court adjudications on the merits. AEDPA's instructions are unequivocal:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

28 U.S.C. § 2254(e)(1). Moreover, under 28 U.S.C. § 2254(d), federal courts must not disturb state court rulings on the merits of claims brought in post-conviction proceedings unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Thus, AEDPA imposes barriers to federal court review of state court merits decisions in habeas proceedings that are mandatory and unequivocal. These barriers foreclose federal habeas review much like the procedural bars cited by the Court in *Gonzalez,* 545 U.S. at 532 n.4 (holding that a petitioner's 60(b) motion does not raise a new "claim" when he "merely asserts that a previous ruling which precluded a merits determination was in error—for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar").

### B. This Court Denied Ms. Pike's Ineffective Assistance of Counsel Claim Because it was Required to Defer to the State Post-conviction Court's Tainted Findings Under AEDPA.

Under AEDPA, this Court accorded a presumption of correctness to factual findings and conclusions of law tainted by specious arguments that the State of Tennessee has now abandoned. To understand the extent to which the state's litigation posture affected the post-conviction court's findings, it is necessary to briefly recount the evidence and argument presented during a hearing held by the state post-conviction court in 2007.

During the state evidentiary hearing, Ms. Pike presented evidence recounting the physical abuse, sexual abuse and rapes she endured throughout her childhood and adolescence. Dr. Jonathan Pincus testified in detail about the sexual violence Ms. Pike experienced and concluded that Ms. Pike had developed Post-Traumatic Stress Disorder as a result. *See* PC Tr. Vol. 3 at 257–59, 263–65, 268, 295–96.

The state vigorously contested Dr. Pincus' conclusions during its cross-examination, repeatedly calling Ms. Pike a "pathological liar." "[Ms. Pike] has lied from day one and she's been a pathological liar," counsel argued. *Id.* at 288. "And yet you're relying on that pathological liar

to render your opinion, isn't that true, Dr. Pincus?" *Id.* at 300. The state then engaged in a lengthy and heated debate with Dr. Pincus about whether Christa was actually raped by Claude Davis when she was 11 years old. *See* PC Tr. Vol. 4 at 304–11.

The state began by casting doubt on children's credibility: "You're aware, are you not, that any child can come forward and allege things and cause a warrant to be taken out, but there has to be some finding to conclude that it actually happened?" *Id.* at 307. The State questioned whether she was penetrated, asking if there was "any other physical evidence that corroborated [Ms. Pike's] story." *Id.* at 308–09. Finally, the State argued that Davis's guilty plea to a lesser crime indicated that no rape took place. *Id.* at 309. In a lengthy colloquy, the State sought to convince Dr. Pincus and the court that the plea—and the light sentence imposed by the court—disproved the eleven-year-old's account of what happened.

> Q: Would it disturb you to know that he never spent a
> day in prison for this crime?
>
> A: Was he found guilty and given a suspended sentence for two years?
>
> Q: He received a suspended sentence, exactly.
>
> A: Oh! He was found guilty!
>
> Q: No, he was –
>
> A: A suspended sentence is a sentence.
>
> Q: -he was actually allowed—he was found guilty of
> sexual assault. He was not found guilty of the sexual
> penetration . . . that you say conclusively happened,
> Dr. Pincus.
>
> A: He was found guilty of a sexual assault and give [sic]
> two years suspended sentence, and you won't agree—you don't agree that
> that happened?
>
> . . .

> Q: I'm agreeing that he was found guilty of a sexual assault, but that's not what Christa Pike said happened. She said she was raped.
>
> A: . . . I'm not a sophisticated lawyer and I don't know the difference between rape, sexual assault, and whatever else it is.
>
> Q: Let me tell you, Dr. Pincus, there is a huge difference.
>
> A: But if somebody is found guilty of sexual assault and given a suspended sentence of two years on the basis of what this child said happened, then it happened. And for her mother to have mocked her for claiming this. . . at that time. . . was an outrage!

PC Tr. Vol. 4 at 310–11.

The State continued its attack on Ms. Pike's credibility in its cross-examination of Dr. McCoy, a psychologist who had compiled a social history of Ms. Pike before trial. The State characterized Ernest Johnson's sexual abuse and rape as "rumors and gossip of the family," PC Tr. Vol. 9 at 856 (April 10, 2008). The State then queried whether it was sexual abuse when Christa's mother's boyfriend twisted her nipples. *Id*. The state suggested that it was "interesting" that Christa had not told her friends about one of her rapes. *Id.* at 878. Then the State insinuated that Ms. Pike had brought on the abuse, commenting that "from a very early age she was drawn [to] and ran with the wrong kind of people." *Id.* at 878–79. In its cross-examination of Dr. Kenner, a psychologist who had been appointed by the court to evaluate Ms. Pike's mental health, the State suggested that Ms. Pike was promiscuous, highlighting the number of sexual partners she had reported. PC Tr. Vol. 2 at 193 (April 11, 2008).

In short, the State used every opportunity to cast doubt on Ms. Pike's experiences of sexual violence and abuse. In doing so, it invoked tropes that court actors have used for decades to discredit survivors of gender-based violence. *See* Sandra Babcock and Nathalie Greenfield,

*Gender, Violence, and the Death Penalty*, 53 Cal. W. Int'l L.J. 327, 382-391 (2023) (discussing a range of tactics prosecutors use "to discredit women's accounts [of gender-based violence] and minimize the relevance of the violence they endured"); Suzanne St. George Coble, Emily Denne & Stacia N. Stolzenberg, *Blaming Children: How Rape Myths Manifest in Defense Attorneys' Questions to Children Testifying About Child Sexual Abuse*, 37 J. Interpersonal Violence 17–18 (2022) (providing an overview of rape myths and their invocation by defense attorneys in sexual assault cases involving children). For example, the State suggested that without corroboration, the post-conviction court could not trust a child's account of sexual abuse and rape. PC Tr. Vol. 4 at 308-09. Advocates for sexually abused children have long fought to overcome this trope, which places an unfair burden on child victims of violence to produce corroboration of their abuse. *See* Babcock and Greenfield, *supra,* at 383. The suggestion that a child survivor of rape cannot be trusted to tell the truth about her experiences of sexual violence is particularly noxious and can infect a factfinder's view of her credibility. *See* Suzanne St. George, Katelin Bliesner, and Stacia N. Stolzenberg, *Memory, Suggestibility, Consistency, and Plausibility: Examining the Effects of Credibility Dimensions on Jury Verdicts in a Mock Child Sexual Abuse Trial*, Psych., Public Policy, & L. 1, 2 (2026).

In addition, the State argued that that Claude Davis would never have been given such a light sentence if he had actually raped Christa. In fact, "sexual assault and domestic violence cases experience high attrition rates—meaning cases are often declined for prosecution or dismissed." Sarah Anderson and Lisel Petis, *From Victim to Defendant: How Justice Falls Short for Women* (Oct. 28, 2025), https://www.rstreet.org/research/from-victim-to-defendant-how-justice-falls-short-for-women/. A recent NBC News investigation based on data gathered from eight major cities concluded that "[l]ess than 4% of reported rapes, sexual assaults, and child sex

abuse allegations" resulted in a sex crime conviction. Lucia Walinchus, Katy Smyser, and Joe Murphy, *A Vanishingly Small Number of Violent Sex Crimes End in Conviction, NBC News Investigation Shows* (Jan. 10, 2025), https://www.nbcnews.com/specials/sex-assault-convictions/. The reasons for this are complex, but the bottom line is that "only a tiny fraction" of sex crimes result in any sentence for the perpetrator. *Id.*

Finally, the State elicited testimony that Ms. Pike was "promiscuous" and had multiple sex partners as a teenager. This was a deliberate attempt to suggest that Ms. Pike was less credible because she was sexually active—a tactic that has been used for time immemorial to slander the character of rape victims. *See* Nathalie Greenfield and Sandra Babcock, *Sex on Trial,* 46 Col. J. Gender & L. 219, 228, 278 (2026) (discussing how prosecutors seek to undermine women's accounts of sexual violence by portraying them as sexual aggressors and noting that such tactics have been used for hundreds of years). Undermining a victim's credibility by portraying her as hypersexual reduces empathy for her as a crime victim and "dehumanizes [her] in the eyes of the decisionmaker." *Id.* at 285. Paradoxically, the characterization of teenaged Christa as "promiscuous" transformed a common symptom of child sexual abuse into an aggravating factor.[5]

The State's persistent attempt to undermine Ms. Pike's credibility as a survivor of child rape during post-conviction proceedings paid off. First, the post-conviction court expressed

[5] Research shows that women and girls who experience child sexual abuse are more likely to have multiple sexual partners and engage in risky sexual activity. *See* American College of Obstetricians & Gynecologists, *Adult Manifestations of Child Sexual Abuse* (Aug. 2011), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2011/08/adult-manifestations-of-childhood-sexual-abuse (noting that women survivors of child sexual abuse are more likely to "have had 50 or more intercourse partners, have had a sexually transmitted infection, and engage in risk-taking behaviors that place them at risk of contracting human immunodeficiency virus (HIV)").

skepticism about the conclusions of Dr. Pincus and Dr. Kenner because they were based largely on what Ms. Pike told them—and Ms. Pike could be lying:

> This court also note that experts must rely on what the client says as well. The evaluations performed have tests to determine if someone is malingering but in part it is up to the professional to determine if someone is lying or telling the truth or partially lying, etc. Dr. Kenner relied upon what the petitioner told him in making his diagnoses and testimony. Dr. Pincus specifically stated that he had relied upon what the petitioner had told him related to the offense and that it was the basis for his opinion related to her state of mind at the time of the offense. He admitted that if she were lying that his would change his opinion as to whether she had premeditated but not as to her diagnosis.

PC Tech. R. Vol. 5 at 74–75 (Findings of Fact and Conclusions of Law, Dec. 10, 2008).

Second, notwithstanding the documentary evidence that corroborated Ms. Pike's account of her rapes, the post-conviction court adopted the State's characterization of the Claude Davis rape, erroneously finding that "Claude Davis was arrested but not convicted." *Id.* at 13. This was untrue. Court records established that Davis pleaded "no contest" to assault charges and ultimately received a suspended sentence. *See* App. 1.

Third, the post-conviction court echoed the prosecution's characterization of Ms. Pike as "promiscuous" and noted that she had had multiple sexual partners. *Id.* at 35. As noted above, this characterization was highly prejudicial. Indeed, since the post-conviction court's evidentiary hearing in this case, Tennessee has passed a rule of evidence prohibiting evidence of a sex crime victim's sexual history in recognition of the prejudicial impact of such evidence.[6] Tenn. R. Evid. 412 (effective July 1, 2022).

---

[6] The Editor's Notes to Rule 412 specify that the rule was passed "to minimize the likelihood that evidence of the alleged victim's sexual history may cause the jury to be unfairly prejudiced against the victim" as well as avoid unnecessary embarrassment of the victim. Tenn. R. Evid. 412 (Editor's Notes).

In habeas proceedings, this Court deferred to the Tennessee courts' findings on ineffective assistance of counsel, as required by AEDPA. *Pike v. Freeman*, 2016 WL 1050717 at *14.

**C. Ms. Pike's Case Presents Extraordinary Circumstances Warranting the Relief She Seeks.**

Because Ms. Pike's Rule 60(b)(6) motion is jurisdictionally proper, the question is whether she has shown "'extraordinary circumstances' justifying the reopening of a final judgment." *Gonzalez*, 545 U.S. at 535 (quoting *Ackermann v. United States*, 340 U.S. 193, 199 (1950)). In evaluating extraordinariness, "it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 866 (1988). This fact-intensive inquiry also involves an assessment of the applicant's diligence, the probable merit of the underlying claims, the interest in finality, and other equitable considerations. *See* 8 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2857 (3d ed. 1998 and Supp. 2026); *Gonzalez*, 545 U.S. at 540 (Stevens, J., dissenting) (collecting relevant factors). Because the facts and circumstances of Ms. Pike's case are uniquely extraordinary, she is entitled to relief under Rule 60(b)(6) to prevent manifest injustice. *Klapprott v. United States*, 335 U.S. 601, 615 (1949); *Henness*, 766 F.3d at 554.

1. <u>The Risk of Injustice to the Parties and the Merits of the Underlying Claim</u>

The risk of injustice to Ms. Pike is obvious. She faces the prospect of execution after a death penalty trial and post-conviction proceedings that failed to give *any* weight to her documented childhood sexual abuse and rape. The risk of injustice to the State is inconsequential by comparison. Indeed, the State has an interest in the fair administration of justice. While the State certainly has an interest in finality of its judgments, that interest pales in comparison to the

harm that would be occasioned by executing a survivor of sexual violence based on specious arguments and unreasonable legal reasoning.

There is also reason to believe that Ms. Pike would prevail if the Court granted her 60(b) motion.

The post-conviction court's findings were clearly unreasonable. As an initial matter, the post-conviction court erroneously found that Claude Davis was never convicted, a finding that rested on the state's misleading characterization of his prosecution during the evidentiary hearing—and ignored the court records that establish his guilt and corroborate Ms. Pike's account of sexual assault. Moreover, this Court's conclusion that Ms. Pike's history of child sexual abuse and rape was cumulative of other mitigating evidence contravenes binding Sixth Circuit precedent.

The Sixth Circuit has confirmed that a survivor's experiences of child sexual abuse are powerfully mitigating in a case involving a youthful offender like Ms. Pike. *See Foust v. Houk*, 655 F.3d 524, 543 & n.9 (6th Cir. 2011) (finding that trial counsel was ineffective for failing to present evidence of child sexual abuse in home and that such evidence was not cumulative). The Sixth Circuit has also clearly held that such evidence is not merely "cumulative" of other mitigating evidence presented in a capital case. *Id.* at 527. This is because child sexual abuse and rape are uniquely devastating. In *Kennedy v. Louisiana*, 554 U.S. 407 (2008), Justice Alito underscored that while "the rape of any victim inflicts great injury, "'[t]he immaturity and vulnerability of a child, both physically and psychologically, adds a devastating dimension to rape that is not present when an adult is raped.'" *Id.* at 468 (quoting Meister, Murdering Innocence: The Constitutionality of Capital Child Rape Statutes, 45 Ariz. L. Rev. 197, 208-209 (2003)); *see also Wharton v. Chappell*, 765 F.3d 953 (9th Cir. 2014) (finding that unpresented evidence of childhood

sexual abuse was different from presented childhood physical abuse and therefore not cumulative and that failure to find and present that evidence may constitute ineffective assistance).

The Sixth Circuit's decision in *Foust* is consistent with precedent from the U.S. Supreme Court. *See Wiggins*, 539 U.S. at 510 (finding ineffective assistance of counsel because counsel failed to present evidence that the defendant was repeatedly molested and raped by his foster father before the age of 16); *Sears v. Upton*, 561 U.S. 945 (2010) (remanding to determine *Strickland* prejudice because trial counsel portrayed defendant's home life as stable when defendant had been sexually abused).

2. <u>The Risk That Denial of Relief Will Produce Injustice in Other Cases</u>

There is a significant risk that denying Ms. Pike's motion will produce injustice in the cases of survivors of sexual violence who have long battled against the tendency of the legal system to minimize their suffering.

3. <u>Ms. Pike Has Exercised Diligence in Bringing this Claim</u>

The grounds for this petition emerged slightly more than one month ago, during a hearing in which the State of Tennessee made an unprecedented concession that Ms. Pike had no way of anticipating. This motion is timely filed.

4. <u>The Risk of Undermining the Public's Confidence in the Judicial Process</u>

It is inconceivable that in the 21st century, the criminal justice system is poised to execute a survivor of rape and child sexual abuse whose jury never had the opportunity to consider those facts in weighing the defendant's moral culpability. The public expects that courts will be fair and reasoned, and that death sentences will be carried out only after a process that guarantees that the person facing execution receives effective legal representation and fair consideration of all of the

evidence weighing for and against the appropriateness of capital punishment. That did not happen here.

Hundreds of women's rights organizations that have spent decades calling for justice for survivors of sexual violence have decried the injustice of Ms. Pike's death sentence. *See* Appendix 1 (Letters from Advocates for Women). The injustice of Ms. Pike's sentence is compounded by her youth at the time of the crime. Scientific research has proven that the brains of adolescents do not fully develop until their mid-20s. *See* Appendix 2 (Letters from Youth Justice Advocates). Ms. Pike committed her crime on the one-year anniversary of a violent rape, after which she received no therapy or victim support services, at a time when she had the brain of an impulsive and immature teenager struggling with untreated bipolar disorder and post-traumatic stress disorder. That the courts would allow her execution to proceed without giving full weight to these facts is unfathomable.

Ms. Pike's execution would stain the justice system and undermine the public's confidence in its integrity.

## CONCLUSION

This Court was compelled to rely on the post-conviction court's demonstrably false findings of fact and the continuing consequences of a litigation position that has now been abandoned by the State at the eleventh hour. Rule 60(b) affords relief under precisely these circumstances. It will prevent the irreversible injustice of the state executing a woman based upon incorrect facts and a litigation position that the State has not only abandoned, but which cannot be reconciled with modern research on the impact of childhood sexual abuse. For all of the reasons stated above, Ms. Pike moves this Court to reopen its judgment.

DATED this 29th day of September, 2026.

Respectfully submitted,

FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.

BY: s/Stephen A. Ferrell
Stephen A. Ferrell, BPR #025170
Assistant Federal Defender
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Phone: (865) 637-7979
Facsimile: (865) 637-7999
Stephen_Ferrell@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this document was filed and served via the Court's electronic filing system on the 29th day of September 2026.

/s/ *Stephen A. Ferrell*
Stephen A. Ferrell

# APPENDIX 1

GCADV

2295 Parklake Drive, NE
Suite 130
Atlanta, GA 30345

p 404.209.0280
f 404.766.3800

www.gcadv.org

Tennessee Governor Bill Lee
Office of the Governor
600 Dr. Martin L. King, Jr. Blvd.
Nashville, TN 37243

September 10, 2026

RE: Request for Commutation of Sentence of Death to Life in Prison on Behalf of Christa Gail Pike

Dear Governor Lee:

As organizations, scholars, individuals, law clinics, and survivors who are dedicated to ending all forms of violence against women, we are writing to urge you to commute the death sentence of Christa Pike to life imprisonment. At the time of the crime for which she was sentenced to death, Christa was an eighteen-year-old survivor of child sexual abuse and rape. It is vital that you understand the significance of her history, and its relationship to the crime she committed, in weighing whether the State of Tennessee should execute her.

Through our work, we have heard many accounts of gender-based violence, including child sexual abuse, rape, and intimate partner violence. From our work with victims, we also know that these experiences can have devastating consequences for victims' mental health and future relationships.

The violence inflicted on Christa Pike falls at the most extreme end of the spectrum of gender-based violence. It is not just that she was a toddler when she was sexually abused for the first time, or that she was raped by three more men before her eighteenth birthday. It is that Christa was forced to cope with her sexual abuse and rape virtually alone, without any of the victim support services that we know are so vital to recovery. Her parents were neglectful at best, and abusive at worst. When Christa developed symptoms of PTSD and bipolar disorder, no one in her life ensured that she received treatment and medication. In short, Christa was consistently failed by the people and systems that should have helped her. Research shows that girls in this situation are disproportionately likely to be incarcerated.

GCADV

2295 Parklake Drive, NE
Suite 130
Atlanta, GA 30345

p 404.209.0280
f 404.766.3800

www.gcadv.org

It matters that Christa was a teenaged girl, rather than an adult man, at the time of the crime. We agree with the non-partisan Council on Criminal Justice, which reported in 2024 that "[w]hile men also experience childhood abuse and other forms of interpersonal victimization, these risk factors function differently in the lives of women and increase their risk for mental health challenges, substance use disorders, and intimate partner violence, all of which can contribute to their involvement in the criminal justice system." So while we do not argue that Christa's life should be spared solely on account of her gender, her experiences of abuse and violence happened *because* she was a girl, at a time when states provided them with far less protection.

Relating to the crime itself, we are struck by two facts. First, the crime was committed nearly a year to the day of when Christa was violently raped by a stranger. We support the finding of Dr. Bethany Brand that this anniversary would have rekindled the trauma of the rape, and that it would have affected Christa's mental health. Second, Christa did not commit this crime alone. She accompanied two other teenagers, one of whom was her abusive intimate partner. That partner, Tadaryl Shipp, received a more lenient sentence—and is now eligible for parole—because he was only 17 at the time of the crime, while she was 18. This disparity in outcomes is deeply troubling, particularly given the abusive character of his relationship with Christa.

We do not minimize the seriousness of the crime that Christa committed. Nor does the sexual violence that Christa experienced at such a young age excuse her crime. But it does provide an explanation for how she came to commit that crime, a context for trying to understand what otherwise might seem incomprehensible. No dispassionate observer could look at the circumstances of Christa's life, including her age at the time of the crime and her mental illness, and believe that she is among the most depraved and irredeemable offenders for whom the death penalty is traditionally reserved. Indeed, her execution would shock the sensibilities of most people who were familiar with the facts of her life.

Victims of violence are complex. A survivor is capable of acts of violence even while she is still a victim of serious trauma. Christa Pike suffered horrific physical and sexual abuse and serious trauma throughout her life, struggled with mental illness, and was a victim long before she became a defendant. Christa Pike has experienced a life-time of punishment and it is now time for mercy. We respectfully urge you to commute her death sentence to life imprisonment.

GCADV

2295 Parklake Drive, NE
Suite 130
Atlanta, GA 30345

p 404.209.0280
f 404.766.3800

www.gcadv.org

Thank you for your serious consideration of this matter.

Sincerely,

Advocates Fighting to End Gender-Based Violence
(full list on following pages)

**State Organizations:**
Free Battered Texas Women
Georgia Justice Project
Healthy and Free Tennessee
Illinois Clemency Project for Battered Women
Illinois Prison Project
Iowa Coalition Against Domestic Violence
Maine Coalition to End Domestic Violence
Ohio Domestic Violence Network
Oklahoma Appleseed Center for Law and Justice, Inc.
Oklahoma Survivor Justice Coalition
Rights and Restoration Law Group, LLC
Safe Harbor of Northeast Kentucky
The Rebuild, Overcome, and Rise (ROAR) Center of University of Maryland - Baltimore
Utah Domestic Violence Coalition
Violence Free Minnesota
Virginia Sexual and Domestic Violence Action Alliance

**National Organizations:**
BGilot Consulting
Center for Constitutional Rights
Center on Gender and Extreme Sentencing
Children's Best Interest Project
Clever Human LLC
Coalition Against Trafficking in Women
Emerge
International Center for Advocates Against Discrimination
Just Solutions: Bringing in Justice
Krystal Clear Foundation Inc.
Life Span
Love & Protect
Phillips Black, Inc.
Prostitution Research & Education
Rights4Girls
Sanctuary for Families
Shared Hope International
SheWhoDares Consulting LLC
Survivors Justice Project
The National Council for Incarcerated and Formerly Incarcerated Women and Girls

**Legal Clinics and Professors:**
Beth E. Richie, Professor at University of Illinois Chicago
Buffalo Human Rights Center at the University at Buffalo School of Law, State University of New York
Carlotta Lepingwell, Clinical Associate Professor at Tulane School of Law’s Criminal Justice Clinic

Carol Jacobsen, Professor at University of Michigan Law School and Founding Director of the Michigan Women's Justice & Clemency Project
Caroline Bettinger-Lopez, Professor at University of Miami School of Law's Human Rights Clinic
Carrie N. Baker, Professor of the Study of Women and Gender and Sylvia Dlugasch Bauman Chair in American Studies at Smith College
Deborah M. Weissman, Reef C. Ivey II Distinguished Professor of Law at University of North Carolina School of Law
Dr. Ann Russo, Professor at DePaul University
Dr. Walter DeKeseredy, Anna Deanne Carlson Endowed Chair of Social Sciences and Director of the Research Center on Violence at West Virginia University
Elisabeth Ward, Clinical Faculty and Executive Director at DePaul University College of Law's International Human Rights Law Institute
Elizabeth Brundige, Clinical Professor of Law at Cornell Law School's Gender Justice Clinic
Francesca Buzzi, Clinical Assistant Professor of Law at Tulane University's School of Law at the Women's Prison Project
Francisco Rivera, Clinical Professor of Law at Santa Clara University School of Law's International Human Rights Clinic
International Human Rights Law Institute at DePaul University College of Law
Jehanne E. Henry, Lecturer in Law at Columbia Law School and Independent Consultant at The Reckoning Project
Kirby Anwar, Visiting Associate Professor at CUNY School of Law's Human Rights and Gender Justice Clinic
Kirby Anwar, Visiting Associate Professor at CUNY School of Law's Human Rights and Gender Justice Clinic
Leigh Goodmark, Marjorie Cook Professor of Law at University of Maryland Carey School of Law's Gender, Prison, and Trauma Clinic
Lisa Fontes, Ph.D., Retired University Professor at University of Massachusetts Amherst
Lisa Goodman, Ph.D., Professor at Boston College
Lydia Watts, Executive Director at The Rebuild, Overcome, and Rise (ROAR) Center of University of Maryland - Baltimore
Margaret Drew, Associate Professor of Law at University of Massachusetts Law School's Human Rights at Home Clinic
Marjorie Miller, Professor of Philosophy Emeritus at Purchase College, SUNY
Meagan Belovsky, Clinical Professor at University of Texas School of Law's Domestic Violence Clinic
Michelle Brown, Professor of Criminology at University of Tennessee, Knoxville's Appalachian Justice Research Center
Nancy Chi Cantalupo, Associate Professor of Law at Wayne State University
Richard J. Wilson, Professor Emeritus of Law at Washington College of Law, American University
Shea M. Rhodes, Esquire, Director & Co-Founder at The Institute to Address Commercial Sexual Exploitation at Villanova Law
Stanislav Moroz, Clinical Associate Professor of Law at Tulane Law School's Women's Prison Project

**Experts and Individuals:**

Amy Bergquist, Associate Program Director of International Justice at The Advocates for Human Rights
Amy J. Sánchez, Chief Executive Officer at Battered Women's Justice Project
Ane Mathieson, Director of Policy, Advocacy & Research at Women Creating Change
Becky Mullins, Housing Advocate at GreenHouse17
Christy Burch, Chief Executive Officer at Ion Center
Cindene Pezzell, Director of the National Defense Center for Criminalized Survivors at Battered Women's Justice Project
Connie Canty at Safe Harbor Women's Shelter
Courtney Paul, Operations Manager at National Resource Center on Domestic Violence
Deena R. Hurwitz, Human Rights Lawyer
Dorchen A. Leidholdt, Senior Director of the Center for Battered Women's Legal Services at Sanctuary for Families
Dr. Kizzy Pittrell, Therapist at Catherine's Cottage
Ekaette Obot, Legal Program Director at Life Span
Elizabeth Flock, Journalist and Author
Ellie Williams, Legal Director, Justice for Incarcerated Survivors Program at Georgia Coalition Against Domestic Violence
Eve Hampson-Barksdale, Mitigation Specialist at Phillips Black
Fatimeh Hussien, Director of Advocacy at Life Span
Giorgia Piantanida, Programs Associate at Coalition Against Trafficking in Women
Holly Helphinstine, Child Advocate at Safe Harbor of Northeast Kentucky
India M., HT/SA Coordinator at TurnAround
Jacquelyn Davis, Attorney at Texas RioGrande Legal Aid
Jane Keiffer, Executive Director at Artemis Center
Jennifer Clark, Manager at New York State Coalition Against Domestic Violence
Jennifer L. Grobelski, Attorney at Law at Life Span
Jessica Hill, RGNV at Life Crisis Center
Jessica Vera, Paralegal at Life Span
Judith Clark, Director at Survivors Justice Project
Julia Yoshimoto, Women's Justice Project Director at Oregon Justice Resource Center
Julie Cousler, Director at Pennsylvania School-Based Health Alliance
Karen Wyman, Director of Prevention and Intervention, Maine Coalition to End Domestic Violence
Kyle M., Domestic Violence Counselor at Life Span
Letty Cottin Pogrebin, Writer
Linda Yanez, Counselor at Life Span
Lisa Glass, Director of Survivor Services at Villages of Hope
Lisa Sloyer, Advocate at TurnAround
Liz Stein, Human Trafficking Specialist at Sex Trade Survivor Caucus
Margaret Byrne, Director at Illinois Clemency Project for Battered Women
Margaret Gotthold, Health Educator Provider at West Miami Community Mental Health
Megan O'Donnell, Social Worker & Domestic Violence Advocate at Life Span
Melissa Farley, Ph.D., Executive Director at Prostitution Research & Education
Michelle Brewer, Independent Consultant Subject Matter Expert

Muriel Fox, Chair of Veteran Feminists of America
Nathalie Greenfield, Associate Attorney at Phillips Black, Inc.
Nicole Harbert, Survivor Leader at Sex Trade Survivor Caucus
Patrice James, Gender-Based Violence Subject Matter Expert and Program Director at Women's Justice Institute
Paul Bellan-Boyer, Reverend at Church of God in Christ, International
Rachel Barkley, Staff Attorney at Battered Women's Justice Project
Rachel Holmes, Managing Attorney at Georgia Justice Project
Rachel White-Domain, Director, Women & Survivors Program at Illinois Prison Project
Robin Levasseur, Survivor Advocate at NEASE
Ryan Koch, Nature Based Healing Lead at GreenHouse17
Sara Bennett, Documentary Photographer
Sharlene Rochard, Survivor Advocate at Rise Survivor Rise
Shelia Boyles, Assistant Director at Safe Harbor of Northeast Kentucky
Sydney McKinney, Executive Director at National Black Women's Justice Institute
Taina Bien-Aimé, Executive Director at Coalition Against Trafficking in Women
Terry Forliti, Executive Director at Alternative Solutions
Tracy Tripp, Attorney at Battered Women's Justice Project
Trent Lund, Advocate at Everybody Rise Up
Tricia Grant, Executive Director at Just Love Worldwide
Vanessa Timmons, Director of Education at Vanessa Timmons Coaching & Consulting
Zoe Bellatorre, Subject Matter Expert in Familial Trafficking and Founder of You Belong

September 14, 2026

Tennessee Governor Bill Lee
Office of the Governor
600 Dr. Martin L. King, Jr. Blvd.
Nashville, TN 37243

RE: Request for Commutation of Sentence of Death to Life in Prison on Behalf of Christa Gail Pike

Dear Governor Lee:

We write today as advocates whose mission is to ensure that victims of gender-based violence are treated with dignity and receive the protection and care they deserve. We work directly with victims and survivors, and we know that sexual and gender-based violence has lifelong consequences for women's mental health.

We feel strongly that in determining whether Christa Pike should be executed or spend the rest of her life in prison, you should consider her long history of child sexual abuse and rape—and society's failure to protect her from those crimes. Christa Pike was a victim long before she was a perpetrator. Although we do not seek to excuse her for the terrible crime she committed, we believe the unique circumstances of her life call for compassion and mercy.

Christa grew up in West Virginia and North Carolina at a time when child sexual abuse was routinely swept under the rug. Our understanding of the traumatic consequences of child sexual abuse has evolved over time, and states have put in place stricter reporting requirements to ensure children like Christa do not fall through the cracks. Unfortunately, these changes came too late to help Christa.

Christa's sexual abuse began before she was in preschool. When she was a toddler, her grandmother's boyfriend sexually abused and raped her, and he got away with it. After she began school, one of her teachers saw signs of abuse and reported it to her family, but Christa did not receive the kind of ongoing support and therapy she needed. Becoming a victim of sexual violence at such a young age derailed her life and helped create the conditions for exploitation when she entered adolescence. Research shows that sexual violence in childhood significantly increases the likelihood of suffering sexual violence in adulthood.

Christa was raped again when she was eleven years old. A man who lived in a nearby trailer grabbed Christa, a defenseless little girl, and raped her. He was jailed for only two weeks after committing one of the most heinous crimes conceivable. For any girl, being raped by a stranger in the neighborhood after experiencing sexual violence in her home would send a message that the world is not safe. The terrifying violence of rape at such a young age is profoundly traumatic

and life-altering. It is not surprising to us that after the rape, Christa withdrew from everyone around her, was distracted in school, and could not keep up with her classwork and homework. Her attempt to end her life when she was twelve years old is consistent with the symptoms of severe trauma resulting from rape.

Some victims of child sexual abuse and rape are able to recover and regain psychological stability with the help of loving family members, sustained therapy, and community-based support. Christa had none of these. Christa's parents routinely left her with abusive caretakers. A boyfriend of Christa's mother punched Christa and sexually assaulted her when she was just thirteen. When Christa was fourteen, Child Protective Services removed Christa from her home and placed her in a residential facility called Sheaffer House. After only three months there, they returned her to the custody of her mother. There was minimal follow-up to ensure Christa's safety; the facility effectively abandoned her to an abusive, dangerous household.

On January 14, 1994, when Christa was seventeen, she was raped again by a stranger who attacked her while she was walking down the street. She sought medical help and reported the rape to police, but the police failed to identify the perpetrator. Christa received no mental health counseling or victims support services after this rape.

Eight months after this rape, Christa entered the Job Corps program in Knoxville, which was designed to help struggling teenagers develop occupational skills. In reality, violence was rampant at the program, and it was shut down in 1995 after U.S. Senate hearings detailed the brutal conditions in the program. At Job Corps, Christa met and became romantically involved with Tadaryl Shipp, another resident at Job Corps. Christa's relationship with Tadaryl bore many of the signs of coercive control, a dynamic common in abusive intimate relationships. He sought to control her movements, hit and kicked her. Research shows that abused girls are likely to be adult victims of physical abuse, including intimate partner violence.

Christa's trial attorneys never presented evidence of Christa's extensive history of rape, abuse, and neglect, despite their knowledge of this history. Perhaps if they had, the jury would not have sentenced her to die. We will never know.

Tennessee has adopted several laws designed to protect victims of child sexual abuse and rape. We are among the many Tennessee advocates who have sought to educate the public about the nature of gender-based violence. We are gratified that Tennessee's leaders have expressed concern about the rights of child victims, and we hope that recent reforms will prevent the kind of abuse that Christa suffered.

We believe that commuting Christa Pike's sentence to life imprisonment would be consistent with Tennessee's concern for girls and women victimized by sexual violence. Extending compassion to Christa would recognize that her crime was committed by a girl still in her teens

who was mentally ill and deeply traumatized by the abuse she endured. We can condemn her crime without condemning Christa to die for it.

Now is an opportunity to recognize the significance of harm that results from child rape and gender-based violence. By commuting Christa's sentence, Tennessee will extend belated protection to the little girl that Christa once was. We respectfully urge you to commute Christa's sentence.

Thank you for your serious consideration of the matter.

Sincerely,

**Tennessee Domestic Violence and Sexual Abuse Organizations**

Avalon Center
Bridges Domestic Violence Center
Center of Hope
Domestic Violence and Sexual Assault Center Rutherford County
Genesis, Inc.
Metro Office of Family Safety
Raphah Institute
Safe Space of East TN
Silent No Longer Tennessee
Tennessee Coalition to End Domestic & Sexual Violence (TCEDSV)
Thistle Farms
WillowBend Farms

**Tennessee Experts on Domestic Violence and Sexual Abuse** (Organizations listed for identification purposes only)

Ashlee Sellars, Head of Restorative Practice at Raphah Institute
Beatriz Zamora, Grant Compliance Specialist at TCEDSV
Brittany Fleenor, CCR & Outreach Specialist at TCEDSV
Chelsie Leonard, Communications and Engagement at TCEDSV
Cindy Sims, Executive Director of Center of Hope
Claire Nelson, Artist
Debbie Rackham, Clinical Coordinator
Denarius Stinson, Domestic Violence Advocate
Edward Smith II, Reverend
Evangeline Barefoot, Registered Nurse and Sexual Assault Nurse Examiner

Grace Tarwater, Advocate
Greta McClain, Executive Director of Silent No Longer Tennessee
Heather Stone, Mom
Jennifer Escue, CEO of TCEDSV
Linda Crockett, Executive Director of Bridges Domestic Violence Center
Linsey Anderson, Advocate
Lucy Wilkinson
Mandy Kidwell-Parkin, Domestic Violence Advocate
Nashaly Collazo, Senior Advocate of Domestic Violence
Patricia Wilkinson, Program Coordinator at TCEDSV
Rana Lynn Boparai, Licensed Therapist and Sexual Assault Advocate
Samantha Kaloi, Director of Programs at TCEDSV
Sarah McKinnis, CEO of WillowBend Farms
Shannon Lynch, Training Specialist at TCEDSV
Tana Kimbro, CFO of TCEDSV
Tasha Bandy Kennard, CEO of Thistle Farms
Tony Garr, Volunteer

September 23, 2026

Tennessee Governor Bill Lee
Office of the Governor
600 Dr. Martin L. King, Jr. Blvd.
Nashville, TN 37243

RE: Request for Commutation of Sentence of Death to Life in Prison on Behalf of Christa Gail Pike

Dear Governor Lee:

We write as organizations and individuals committed to raising awareness of Adverse Childhood Experiences (ACEs), preventing childhood trauma, and helping children and families overcome its lifelong effects.

Our work is grounded in a fundamental understanding: what happens to children matters. Abuse, neglect, violence, household instability, substance abuse, the loss of caregivers and other serious adversities during childhood can have profound and lasting effects on a child's developing brain, physical and mental health, relationships, behavior and ability to regulate emotions. We also know that the effects of childhood adversity can compound. The greater the number and severity of adverse experiences a child endures—particularly when there is no stable adult, intervention or treatment—the greater the potential consequences across a lifetime.

For those reasons, we believe Christa Pike's extraordinary history of childhood adversity should weigh heavily in your consideration of her request for clemency.

Christa experienced virtually every form of adversity that those of us who work in this field seek to prevent. Her childhood was marked by chronic sexual abuse and rape, physical and emotional abuse, neglect, caregiver substance abuse, domestic and family violence, poverty, food insecurity, repeated moves and changes in schools, unstable caregivers, and the loss of the one adult she experienced as a consistent source of love and security.

These experiences did not occur once or during a single difficult period. They began when Christa was extremely young and continued throughout her childhood and adolescence. She was raped and sexually abused before she was old enough to attend school. She was physically abused by adults entrusted with her care. She lived amid alcoholism, drug use and violence. She repeatedly moved between homes and schools. When she reported abuse, the adults around her frequently failed to believe or protect her. When she exhibited signs of serious psychological distress, she did not receive the sustained treatment she needed.

Dr. Bethany Brand, a clinical psychologist with more than 30 years of experience studying and treating trauma-related disorders, conducted an extensive forensic psychological evaluation of Christa. Dr. Brand described Christa's childhood as characterized by "poverty, extreme and chronic sexual, physical, and emotional abuse as well as neglect." She concluded that, even compared with other severely traumatized people she has evaluated during her career, Christa's childhood abuse and neglect were extraordinarily severe. Her report details that Christa experienced 9 out of 10 ACEs, more than 99.3 percent of the U.S. population. Dr. Brand states in her report "Furthermore…Christa did not experience a single perpetrator for each of the ACEs. Rather, *many* adults mistreated and abused her in a multitude of ways."

What happened to Christa is important not because it excuses what she did. It does not. The murder of Colleen Slemmer was horrific, and nothing about Christa's childhood diminishes the terrible loss of Colleen or the suffering of her family.

But understanding childhood adversity requires us to reject the idea that experiences of this magnitude can simply disappear. Dr. Brand explains that as the number and types of childhood traumas increase, so too can the severity and breadth of lifelong difficulties. Severe maltreatment can affect brain functioning, the stress-response system, emotional and behavioral regulation, relationships, attention, learning, memory, and the ability to solve problems adaptively rather than impulsively.

Christa entered adulthood carrying those accumulated harms with her. She was only 18 years old at the time of the crime. She was suffering from serious, untreated mental illness and the consequences of years of unaddressed trauma. Christa's chronic trauma and psychiatric disorders directly affected her ability to process stressful situations and regulate her emotions.

Christa's story is, in many ways, a devastating illustration of why the movement to understand and address Adverse Childhood Experiences matters.

Today, we know much more about identifying childhood trauma and intervening before its effects become entrenched. We promote trauma-informed care and train teachers, health care professionals, social workers, law enforcement officers and others to recognize signs of abuse and trauma. We work to strengthen families, build resilience, provide children with safe and stable relationships, and connect children experiencing adversity with mental health treatment and other supports.

Those systems didn't exist, or, if they did, they repeatedly failed Christa more than 30 years ago.

The significance of that failure becomes even clearer when we consider what happened once Christa finally received treatment. After years of treatment, Dr. Brand describes Christa as thoughtful and even-tempered, with deep remorse for her actions, and concludes that she has matured, learned to process her trauma and developed tools to regulate her emotions and respond to life's stressors.

That transformation reinforces something those of us who work to address childhood adversity know well: trauma can have profound consequences, but intervention, treatment, stable relationships and support can make a profound difference. Unfortunately, Christa did not have that intervention early in her life.

Governor Lee, Tennessee has made significant investments in strengthening children and families and recognizing the importance of addressing childhood trauma before its consequences follow children into adulthood. Clemency in this case would be consistent with those principles. It would not erase Christa's crime or free her from accountability. Commuting her sentence to life imprisonment without parole would ensure that she remains accountable for the rest of her life.

Commuting Christa's sentence would hold her accountable for the terrible crime she committed while recognizing what decades of research have taught us about the lifelong consequences of severe childhood adversity.

When Christa was sentenced to death in 1996, the extensive research that we have today about ACEs and their cumulative effects was not readily available to inform the understanding of her life and behavior. Indeed, the jury never heard the full extent of the extraordinary trauma she endured and how, combined with her age and untreated mental illnesses, affected her development, emotional regulation and behavior. Clemency offers the opportunity to apply that understanding now and find a more complete and informed understanding of the child she was and the profound consequences of what happened to her.

Commutation would also recognize what we have learned about childhood adversity since Christa was a child: children who endure repeated, severe trauma without protection or treatment can carry its consequences throughout their lives.

Christa Pike was failed repeatedly as a child. We cannot undo those failures, but we can acknowledge their significance now.

We respectfully ask you to commute Christa Pike's death sentence to life imprisonment without parole.

Thank you for your serious consideration of this matter.

Sincerely,

Stand for Children

Barbara Holden Nixon, LCSW, retired ACE advocate and consultant
Anne G Fisher
Janie McCrary
Ellen Klyce
Blanche Deaderick
Ann Herrod
Cristina Pinkham
Clay Francis
Rev. Amy Howe
Cardell Orrin, Stand for Children
Dorothy Burke
Gloria Felsenthal
Anne Stokes
Elizabeth Bran
Sally Thomason
Mim Stokes Brown
Sam Gary
Gaye Henderson
Elizabeth Dixon

Barbara Key
Rev. David Powers, Idlewild Presbyterian Church
Jenny Nevels
Lyn Bailey
James Boyd
Allison Garrott
Martha Boyd
Lee Giovannetti
Amanda Rough
Lynn Reasons
Robin Karr Morse
Ginny Nearn
Susan Mackenzie
Susan Mallory
Mary Morris
Victoria A. Thomas
Amanda Bradley
Donna Dabov
Howard Eddings
Mary Mondonico Reed
Gregory S. Gianis
Farley Ezekiel
Rabbi Micah Greenstein
Anne Bradley Thomas
Allison McClellan
Wynn Robinson
Karen Henson
Nancy Lawhead
Caitlin Bankston, Sobieski, Messer & Elledge, PLLC

# APPENDIX 2

September 10th, 2026

Tennessee Governor Bill Lee
Office of the Governor
600 Dr. Martin L. King, Jr. Blvd.
Nashville, TN 37243

RE: Request for Commutation of Sentence of Death on Behalf of Christa Gail Pike

Dear Governor Lee:

We are writing to you as youth justice advocates who have worked closely with children and adolescents who have been victims and perpetrators of violence. Our experience in the field of youth advocacy has shown us that too often, children who face adversity early in life without protection from adults or institutions develop into adults who come into conflict with the law. Christa Pike's life is emblematic of this tragic reality.

We strongly urge you to consider the circumstances of Christa's childhood before you determine if she should be executed or spend the rest of her natural life in prison. Beginning when she was a toddler, the adults in Christa's life subjected her to sexual abuse, physical violence, neglect, and abandonment. Adult men sexually assaulted and raped her as during three critical developmental periods: when she was a preschooler, when she was 11 and on the cusp of puberty, and when she was 17 and a still-developing adolescent. This took place against a backdrop of severe neglect and abandonment by her parents.

Christa repeatedly sought help and protection from her parents, schoolteachers, and police officers while she was growing up in North Carolina and West Virginia. None provided the support she needed. This points to a failure not only on the part of her caregivers, but on the part of the states themselves. Instead of ensuring she received structured counseling, treatment, and support, they ignored the unmistakable signs that she was a child in severe distress—including suicide attempts, poor performance in school, and truancy.

Administrators in two different youth facilities where Christa spent time--the Sheaffer House and the Swannanoa Juvenile Evaluation Center--knew that her parents were unable or unwilling to provide her with a safe home, yet she was returned to that environment when not in custody. When Christa ran away, she was punished and treated as a delinquent. Throughout her childhood, her cries for help, including suicide attempts, were continually ignored.

As youth advocates, part of our work is to educate the public on the ways in which children are fundamentally different from adults. These differences are essential to understanding why children deserve special care, protection, and consideration under the law. Much of the legal framework surrounding children's rights has evolved over the decades since Christa was sentenced to death. And our understanding of adolescent behavior has been profoundly altered by scientific research on adolescent brain function and development that did not exist at the time of Christa's capital murder trial.

It is now known that the prefrontal cortex, the part of the brain associated with decision making and judgement, does not finish developing until approximately age 25. Emerging research has also demonstrated that there is no substantial difference between the brain of a 17-year-old teenager and the brain of an 18-year-old teenager. This means that when Christa committed her crime, there was no meaningful difference between her brain, and by extension, her decision making and culpability, and that of her 17-year-old boyfriend, abuser, and co-defendant, Tadaryl Shipp, who was sentenced to life with the possibility of parole.

Children also deserve special protection because of their lack of power. As wards of their parents or caregivers, children are uniquely vulnerable members of society who are not entrusted with decision making power over their lives, with few exceptions. This is in recognition of their immaturity and vulnerability, realities that do not vanish the moment their 18th birthday arrives.

Christa's life prior to the crime was shaped by the actions of adults who lacked the love, care, and accountability a child needs to thrive. This reality does not excuse her crime, but it does help contextualize it as a tragic outcome of a child's life that was defined by violence.

Due to the inexperience and ineptitude of her trial attorneys, the jury who sentenced Christa to die never heard about the realities of her childhood. We believe this fact, alongside the new science on brain development in adolescents, warrants the commutation of Christa's death sentence. This sentence would provide legal finality to the family of Colleen Slemmer, while also extending mercy to Christa. Mercy that we believe, is far overdue.

Thank you for your serious consideration of the matter.

Sincerely,

| | | |
|---|---|---|
| Cardell Orrin<br>Executive Director<br>Stand for Children TN | Chester L Williams<br>Chief Executive Officer<br>Always Giving Back Memphis, Inc | Andrew Keats<br>Senior Attorney<br>Juvenile Law Center |
| Nina Gurak<br>Policy and Education Director<br>Healthy & Free Tennessee | Shirley Bondon<br>Executive Director<br>African American Clergy Collective of Tennessee | Shirley Bondon<br>Executive Director<br>Black Clergy Collaborative of Memphis |
| Dawn Harrington<br>Executive Director<br>Free Hearts | Xavier McElrath-Bey<br>Executive Director<br>Campaign for the Fair Sentencing of Youth | Alison Flaum<br>Director<br>Northwestern Children & Family Justice Center |
| Margaret D. Roblyer<br>CALEB | Rev. Lindsey Hammond<br>Deputy Director<br>Restore Justice | Rafiah Muhammad - McCormick<br>CEO / Founder<br>Rodney's Village |
| Sara Richardson<br>Treasurer<br>United Women in Faith of First-Centenary UMC | Lori Smith<br>Social Action Committee<br>United Women in Faith | Donna Palmer<br>Scenic South District Holston Conference<br>United Women in Faith |
| Tim Jones<br>Director of Communications<br>Holston Conference of The United Methodist Church | Kenneth Muhammad<br>ARC Program Manager | Travis Claybrooks<br>CEO |
| Sarah Rantz<br>Social Worker | Denise Bell<br>President | Sarah Clegg<br>Ministry Staff |
| Jyoti Nanda<br>Professor of Law | Mona Geer<br>Southeastern Jurisdiction Treasurer | Peter L. Palmer<br>Former Trustee |
| Caroline Archer<br>Reverand | Makenzie Graham<br>Communications Manager | Charles T. Neal<br>Minister Emeritus |
| Rev. Jason N. Gattis<br>Senior Pastor | Michelle Brown<br>Professor of Sociology and Criminology | Barbara Kay<br>Teacher |
| Beth Cruz | Kathleen Greene Austin | Camille Rambajue |
| Hayley Little | Angelia Nicole Moore | Jeanne Rybolt |
| Vicki Vincent | Ella Howard | Sandra Jenkins |
| Sue Hagan | Madison Rollings | Melissa Loyd |
| Melinda Craft | | |