Vol. 13

FILED
BY MIKE HAMMOND
AUG 2 0 2026
KNOX COUNTY CRIMINAL COURT
KNOXVILLE, TN

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | Criminal Court for Knox County |
| | ) | No.58183A |
| Respondent, | ) | |
| | ) | No. M2020-01156-SC-DPE-DD |
| vs. | ) | |
| | ) | |
| CHRISTA GAIL PIKE, | ) | Special Master W. Mark Ward |
| | ) | |
| Movant. | ) | |

EXPEDITED TRANSCRIPT OF THE EVIDENCE

Volume 1 of 1

(Proceedings on August 13, 2026)

THE HONORABLE W. MARK WARD, PRESIDING JUDGE

APPEARANCES

FILED
AUG 2 8 2026
Clerk of the Appellate Courts
REc'd By ______

COMPLEX CASE ATTORNEY:
Paul Bruno

FOR THE STATE:

OFFICE OF THE TENNESSEE ATTORNEY GENERAL
P.O. Box 20207
Nashville, Tennessee 37202
John W. Ayers
David Wickenheiser
Samantha P. Morris
Catherine Cline
Matthew Kubicek

FOR THE MOVANT:
(Defendant Pike and Attorney Denise Deanjalo appearing via video)

FOR THE MOVANT:

FEDERAL DEFENDER SERVICES OF EAST TENNESSEE, INC.
800 S. Gay Street, Suite 2400
Knoxville, Tennessee 37929
Luke P. Ihnen
Stephen A. Ferrell
Susanne Bales

COURT REPORTER:

Karen B. Jinks
1304 Snyder School Road
Knoxville, Tennessee 37932
(865) 789-9320

TABLE OF CONTENTS

PAGE NO.

(Proceedings on August 13, 2026):

Judge Ward addressing attorneys prior to testimony -- 5

STATE'S PROOF:

ELIZABETH CAMPBELL, MSN RD CRNI VA-BC

Direct Examination by Mr. Ayers -------------------- 8
Cross Examination by Ms. Bales --------------------- 24

Presentations on behalf of the Movant,
By Mr. Ferrell ---------------------------- 59

Presentations on behalf of the State,
By Mr. Ayers ------------------------------ 78

Final Presentations on behalf of the Movant,
By Mr. Ferrell ---------------------------- 93

Court's Comments to Attorneys ---------------------- 97

## EXHIBITS
(August 13, 2026)

| | PAGE NO. |
|---|---|
| Exhibit No. 30, Declaration and Curriculum Vitae of Elizabeth A. Campbell, MSN RD CRNI VA-BC -- | 11 |

IN THE SUPREME COURT OF TENNESSEE

AT NASHVILLE

STATE OF TENNESSEE, )
Respondent. )
v. )
CHRISTA GAIL PIKE, )
Movant. )

(Whereupon, this cause came on for hearing and hearing was held on the 11th through 13th days of August, 2026, before the Special Master W. Mark Ward, presiding over the proceedings held in Knox County Criminal Court, Knoxville, Tennessee, when the following proceedings were held on the 13th day of August, 2026:)

THE COURT: Good morning, everyone. I hope everyone had a good night's sleep. The State has one more witness?

MR. AYERS: Yes, Your Honor. The State calls Nurse Elizabeth Campbell.

THE COURT: Ms. Campbell, can you hear us?

THE WITNESS: Yes, I can hear you. It appears that my camera is not showing you. I can try to log on quickly through my phone. I

apologize. I can't see everyone.

MR. AYERS: If you log out and log back in, that might fix it.

THE COURT: Are you on a laptop, ma'am?

THE WITNESS: I am on a laptop.

THE COURT: Does the laptop have the camera?

THE WITNESS: Yes.

THE COURT: And --

THE WITNESS: Yes, and I can --

THE COURT: -- is there a cover over the hole that has the camera in it?

THE WITNESS: No, sir. And I've been working on it -- no. I do apologize. Let me log out and come back in.

THE COURT: The State provides me with a docking station and the camera is over it and I have a fear of -- it's never open, but the first time I got on it and tried to -- I couldn't figure out why this camera was not working.

While we're pausing, I'll -- knowing that you're working up your closing pitches and you'll be working up your arguments, I wanted to make a comment about my book report thing. I don't want anybody to misunderstand. This Court is well

aware that experts can rely upon literature reviews so long as the literature is the type material that that expert would use in their profession and reasonably rely upon those and they're reliable.

Of course, in this case, we've had an unusual situation trying to find an expert on hanging. This is an archaic form of punishment in -- can anything like that, in assessing the weight of an expert's testimony, you look at what they relied upon in their references and we look at their knowledge of those records. I very much enjoyed yesterday's discussion of that -- the attorneys had with the doctor about the references he had in his report. And a really intelligent discussion and cross examination was very helpful. But when you have an expert that -- is something like hanging that his references don't contain any references to any judicial hanging. And then when you -- he provides us statistics or maybe he doesn't know where he got that statistic from, knows nothing about the source with nothing -- unlike yesterday's cross examination with (inaudible) where the doctor was very familiar with the underlying materials that he cited. When

an expert can say, well, I read it but I don't know where it is, I don't know what the study involved, I don't know the time frame of the study, I don't know what the definition of botched is, I don't know -- I don't even know who the author is. I say all this to say sometimes experts give book reports and sometimes they give evidence based on information that they reasonably can rely upon in their field. I don't know how you can reasonably rely upon some information that you don't even know anything about, except the result that backs up your opinion. So, I don't want there to be any mistake for the Supreme Court to believe that this Court misunderstands the ability of experts to make literature searches but the Court, in weighing those, has to look at those closely. So, sometimes it's a book report and sometimes it's not. And oftentimes it's somewhere in between. So we'll just see.

Are we ready on this witness?

MR. AYERS: Nurse Campbell, can you hear us?

THE WITNESS: I can hear you.

THE COURT: Nurse Campbell, would you raise your right hand?

THE WITNESS: (Complies with request).

(Whereupon, the witness was duly sworn and testified as follows:)

ELIZABETH CAMPBELL, MSN RN CRNI VA-BC,

called as a witness, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. AYERS:

Q. Nurse Campbell, could you please state your name and spell it for the Court?

A. Elizabeth Campbell, E-l-i-z-a-b-e-t-h C-a-m-p-b-e-l-l.

Q. And could you please describe your educational background?

A. I have an Associate's Degree in Nursing, which I received in 1991, I have a Bachelor's in Science and Nursing and a Master's in Science and Nursing.

Q. And do you currently work as a nurse?

A. I do.

Q. How long have you been a nurse?

A. Close to 35 years.

Q. Do you hold any certifications?

A. I do. I have a Vascular Access Board Certification and I have Certified Registered Nurse of Infusion certification.

Q. How long have you held those certifications?

A. The Vascular Access Board Certified is a newer one that I sat for last month. The Certified Registered Nurse of Infusion, I sat for in 2001.

Q. And with the certification that you got in 2001, do you have to recertify?

A. Every three years.

Q. And what's involved in that process?

A. You can either recertify by sitting for the exam again, which I opt not to. You can also attend conferences, national conferences on education and continuing education solely in Infusion and Vascular Access.

Q. Are you currently employed as a nurse?

A. I am.

Q. And can you describe what you do?

A. I -- probably about 50 to 60 percent of my time is spent at the bedside with patients, assessing their vascular access and consulting with physicians, nurses, and other providers to recommend the correct access for the patient. And the other portion is actually education of nurses and physicians and physicians assistants on assessing patients for vascular access, coming up with what their correct vascular access needs would be for whatever the therapy is that they're going to be receiving.

Q. Do you place IVs as part of your job?
A. I do, every day.
Q. And do you place IVs in patients with difficult-to-access veins as part of your job?
A. Yes, I do.
Q. How often do you do that?
A. Also every day.
Q. When was the last time you placed an IV?
A. Yesterday.
Q. And are you a member of any professional associations?
A. I am. I belong to the Association for Vascular Access, and that is the governing body that produces the VA-BC certification. And I belong to the Infusion Nurses Society, both as a member and I do review of their journals and their standards of practice.
Q. Have you given presentations on the topic of vascular access?
A. I have. I've given them nationally and locally. I have gone across the country to do some courses and I go to national conferences, as well.
Q. And did you draft a declaration for this case?
A. I did.
Q. And is a copy of your CV attached to

that declaration?

A. Yes.

MR. AYERS: I'm now going to move Nurse Campbell's report and CV into evidence.

THE COURT: Any objection?

MS. BALES: No, Your Honor.

THE COURT: All right.

MR. AYERS: May I approach, Your Honor?

THE COURT: Sure. Are we going to have them combined in one exhibit?

MR. AYERS: Yes, Your Honor, if that's all right.

THE COURT: Marked as Exhibit 30, I believe.

COURT REPORTER: Yes, sir.

(Whereupon, Exhibit No. 30 was marked and received into evidence.)

Q. Nurse Campbell, do you have a copy of this report handy that you can refer to?

A. Yes.

Q. And does your CV reflect the work history you just discussed?

A. Yes.

Q. Have you ever placed an IV in someone

with thrombocytosis?

A. I don't specifically -- although, actually I shouldn't say that. I don't specifically remember somebody with thrombocytosis, although yesterday I did actually sit with a patient that has a very similar type of blood disorder that causes this -- the potential same type of outcomes with clotting quickly.

Q. And have you testified as an expert in other cases?

A. I have.

Q. Have you ever been excluded as an expert before?

A. No, I have not.

MR. AYERS: At this time, the State would offer Nurse Campbell as an expert in general nursing and vascular access.

MR. AYERS: Any objection?

MS. BALES: We don't object to her being offered as an expert in nursing and vascular access. If she starts testifying extensively about thrombocytosis, we would want to voir dire her about that.

THE COURT: Do you anticipate that?

MR. AYERS: No, Your Honor.

THE COURT: Okay. I will allow her to

testify in those fields.

Q. Now, based on your expertise, Nurse Campbell, can you explain to the Court how IV access is generally obtained -- let me clarify that -- how peripheral IV access is generally obtained?

A. So, you would approach the patient, excluding all the before work with orders and such. And where I've worked, we have what we call an IV start kit, which is pretty standard, where you have a little kit that has the tourniquet that's needed to stem the vessels in the peripheral areas. I would put the tourniquet on whichever arm -- typically we choose the dominant arm, the dominant side because those vessels tend to be the better vessels for patients because of, you know, our use of our dominant side. I would then palp (sic) for vessels to see what would be the most appropriate, in the most appropriate area, for whatever therapy we're doing. And then we have -- in my kits we have something called a swab -- a chlorohexidine swab that actually can help the vessels plump a little bit as well. And once I've determined where I'm going to place the IV and where I'm going to be absolutely sure with my site, I will then prepare my catheter, speaking with the patient the entire time and then hold traction on the vessel and -- edge of the vessel with my -- over the -- over-the-needle catheter. We'll --

Q. Now in preparing --

A. Sorry.

Q. In preparing your report, did you review documents from this case including an order from the Tennessee Supreme Court?

A. I did.

Q. And did you see term "small veins" in those documents?

A. I did.

Q. Referring to paragraph eleven of your report on page four, you state. "Patients often self-identify as having small veins." Can you explain to the Court what that term "small veins" means to you as a nurse?

A. To me as a nurse, as a practitioner in this field, it means that the impression potentially that they have small veins. And that could come from many ways. It could come as they've been told over time if they've had -- if they've had practitioners that weren't necessarily as skilled and able to access their vessels, or if they've had difficulty getting their vessels accessed for either labs or IV catheters in the past. But it's hard -- with different body habitus, it's hard to actually quantify who has an actual small vessel because the actual vessels can be larger than we -- we can -- that can, once we put the tourniquet

on, they're much easier to palpate.

Q. So, to your knowledge, is small veins a medical diagnosis?

A. No.

Q. Do you ever encounter patients as a nurse who self-identifies having small veins?

A. Yes.

Q. How often does that happen?

A. Daily.

Q. And have you secured IV access in patients like that?

A. Yes.

Q. How do you go about doing that?

A. I do it with the procedure that I just described. If I can't actually locate something immediately, I will oftentimes either institute gravity -- you know, have the peripheral -- the arm hang down off of whatever area we're using to help gravity get some of the vessels to plump up. Warmth can also happen. And there are also vein visualization devices that are available at many facilities. I don't normally use those because I don't usually have much of a difficulty, but they're available if needed.

Q. Have you ever heard of something called a DIVA scale or a DIVA score?

A. I have.

Q. Can you explain what that is?

A. Sure. It was a term that's come out and it's been used now actually internationally and my institution incorporated it into our nursing notes to help --

MS. BALES: Objection. I --

THE COURT: One second, ma'am. I think she's making an objection.

THE WITNESS: Oh, sure.

MS. BALES: Discussion of a DIVA scale is not in her report. So I just would like clarification to lay a foundation for this to be appropriate.

MR. AYERS: Yes. She was asked is she familiar. She is. And she's now going to explain how it relates to her field of expertise.

MS. BALES: Okay. She's -- is that -- is she going to testify about Ms. Pike's veins in relation to that?

MR. AYERS: Right now, she's going to testify about what she knows about a DIVA scale.

MS. BALES: Okay. We just want to make sure that what she testifies to has been disclosed.

THE COURT: If you hear something that's

out of place, just hop right back up and we'll address it.

MS. BALES: Thank you, Your Honor.

MR. AYERS: I'll ask the question again, Nurse Campbell.

Q. Can you explain what a DIVA scale is?

A. Yes. It's a scale that's used internationally. There are four levels on the DIVA scale to tell -- that can help future practitioners if you encounter a person that has what we call Difficult IV Access, which is what DIVA stands for, you can help to prepare other practitioners or let providers know that you've identified this patient as having difficult access and what type of interventions you recommend for either that particular encounter or for future encounters.

Q. And are there any factors that go into this consideration of a DIVA scale or score?

A. Yes. It can have to do with the availability of -- we often run into patients that may only have one arm available for vascular access due to comorbidities, breast cancer with lymphoma removal, things like that. It can also help us to indicate patients who have had multiple IVs over a period of time. They may be in the hospital for a long period of time and their vessels have become exhausted based on all the therapies that they're

receiving. And it can also tell us if the patient has scar tissue in vessels or help us identify patients who may be -- have used substances in the past via their vessels that can also make these vessels no longer available. And we document these in our nursing notes every day.

Q. So have you personally documented a DIVA score in a patient's medical records before?

MS. BALES: Your Honor, I'm going to object.

THE WITNESS: Yes.

MS. BALES: One, what she has done at her facility under the guidelines at that hospital does not speak to what the medical providers at the prison do. And second, this is not in her report.

MR. AYERS: This is well within the field of her expertise. It's been an issue that's been raised in this case by the Plaintiff's experts. She has personal familiarity with what it is. What I will not be asking her to do is to attempt to assign any sort of score to Ms. Pike. Because as the testimony will show, Nurse Campbell has not examined Ms. Pike. So I'm not asking her to go outside of her own personal knowledge to testify as to anything related to this score.

MS. BALES: Your Honor, it's not in her report, any discussion of this, the DIVA scale. It's not been disclosed, it's not in her report. We would ask that she not be allowed to testify --

THE COURT: I thought there was a mention of a DIVA scale earlier in this hearing.

MS. BALES: Pardon?

THE COURT: Didn't one of the other experts talk about the DIVA scale?

MS. BALES: She did talk about risk factors for access to veins, but she didn't talk about the DIVA scale. That's a separate instrument that has not been --

MR. AYERS: I cross examined Dr. Van Norman about the DIVA scale and it was in her report.

THE COURT: Well, anyway, you may be correct and so what's my remedy. I mean, the exclusion of something like this as an extreme remedy is relevant and so I'm going to allow it. Even though it might be outside her report, I'll allow it.

MS. BALES: We would ask the opportunity to rebut that if we think that is warranted.

THE COURT: Sure. Absolutely. And you

still have the opportunity to put on any rebuttal proof you want to put on.

**MS. BALES:** We do, Your Honor.

**THE COURT:** I'm not foreclosing anything.

Q. So, the question, I'll repeat, have you ever personally entered a DIVA score into a patient's medical records?

A. Yes, daily.

Q. And if you, as a nurse, encounter such a score in a patient's medical records, does that tell you anything?

A. It tells me that I need to really potentially bring extra tools with me to assess a patient.

Q. And if a patient does not have a DIVA score in their medical records, does that tell you anything?

A. Yes, it tells me that they likely do not have difficult access at all.

**MS. BALES:** Your Honor, I object to that. That's completely irrelevant to what we know about -- there's no foundation for that being the case for the way the records are documented in Ms. Pike's case.

**THE COURT:** I'll note your objection, but I'm going to overrule.

Q. Have you reviewed Ms. Pike's medical records?

A. (No response.)

Q. Nurse Campbell, I'm not sure if you heard. Have you reviewed Ms. Pike's medical records?

A. Yes, I have.

Q. Did you review those records for any information that might be relevant to IV access?

A. Yes, I did.

Q. In your record review, did you see any records that indicated that Ms. Pike's veins would be difficult to access?

A. Not based on what I read in the records.

Q. Did you see any records concerning phlebotomy?

A. I did.

Q. Did you draw any conclusions from those records?

A. The records that I saw from -- I did draw conclusions.

Q. Can you explain those?

A. Yes. Based on what I saw, there were a number of documented phlebotomy visits. And with the exception of one of them, all of the phlebotomy procedures were successful on the first attempt. And on one of the

attempts it took two attempts to secure access with the phlebotomy.

Q. And what, if anything, did that tell you about venous access?

A. That tells me that that's pretty standard to do one to two attempts. So that tells me that this is a standard not-difficult-to-access patient.

Q. Did you notice in those phlebotomy records where the blood was drawn from?

A. Yes. There were three different areas. The hand, what's called the forearm, and what's called the antecube which is the area of the bend of the elbow.

Q. In any of those records, did the location of the blood draw lead you to draw any conclusions about venous access for Ms. Pike?

A. No.

Q. Did those phlebotomy records indicate the size of the needle that was used to draw blood from Ms. Pike?

A. Yes.

Q. Do you recall what size needle was used?

A. Yes. They were the standard 23-gauge phlebotomy needle, butterflies.

Q. You just referred to that as a standard 23-gauge needle. Can you explain why?

A. That's very frequently used for phlebotomy, especially in the hospital setting. But that is very frequently used for people -- it's less painful.

Q. Did you draw any conclusions from the fact that a 23-gauge needle was used to draw blood from Ms. Pike?

A. No. That's the standard needle.

Q. Now, you stated at the beginning of our time together that just yesterday you had seen a patient with a clotting disorder of some kind; is that correct?

A. Correct.

Q. Have you ever started IVs in patients with platelet disorders?

A. Yes, both too many platelets and too little platelets, yes.

Q. Let's talk about patients with too many platelets. Are you aware of Ms. Pike's platelet counts?

A. Counts, I'm not, no.

Q. Are you aware that she alleges that she has a condition that results of elevated platelet counts?

A. Yes.

Q. And you have started IVs in patients with elevated platelet counts, have you?

A. I have not with a particular quote/unquote diagnosis, but yes I have.

Q. If it comes to your attention as a nurse that a patient has an elevated platelet count, do you take that into consideration when placing an IV?

A. That doesn't -- well, in placing the IV, likely, I would -- which I always prefer to go in a forearm because those are the most stable areas to place an IV, but it would be more having to do with the aftercare and the infusion and what exactly our goal is in starting this IV.

Q. So, in terms of achieving the IV access, would you do anything different --

A. Uh-huh.

Q. -- for a patient with an elevated platelet count?

A. No.

MR. AYERS: Those are all my questions. Thank you, Nurse Campbell.

THE WITNESS: Thank you.

THE COURT: Cross examine.

CROSS EXAMINATION

BY MS. BALES:

Q. Good morning, Nurse Campbell. My name is --

A. Good morning.

Q. -- Susanne Bales. I represent Ms. Pike. I'd like to talk a little bit about your more recent

experience. What is the most recent presentation that you've given?

A. It was last September, I believe, in -- at the Association for Vascular Access in Orlando, I believe.

Q. So that was in 2025?

A. Correct.

Q. How many presentations did you give in 2025?

A. Probably one.

Q. Okay. And how many presentations did you give in 2024?

A. I'm not sure if I did. I'm sorry. I don't have my CV in front of me.

Q. You're not sure if you did give presentations in 2024?

A. I don't remember off the top of my head. I can pull up my CV. I apologize. I didn't ...

Q. Okay. Could you pull it up? I'm just confused because the CV shows your last presentation was in 2015. But --

A. Oh. Oh.

Q. -- when you discussed your CV or when you were discussing how many presentations you did you said you had done several recently. So I'm trying to

understand --

A. Yes.

Q. -- what you did recently.

A. Oh, hmm. Let me -- hold on one second.

(PAUSE)

A. I have it. Let's see. It says my last presentation was 2015?

Q. Yes, ma'am.

A. Is that -- so, what I have on my presentations, the last one on the list I have is Update Your Infusion Therapy Toolbox. Is that what you're referring to?

Q. Yes.

A. Yes. And above that, there is Mentoring Graduate Note, that's 2013. I have Urban Legend of the 10 ml Syringes presented to the Infusion Nurses Society in 2019. And then 2021, I have Myths Associated with Vascular Access and Infusion Therapy in August of 2021.

Q. I don't see that on your CV.

A. No -- that's weird. Okay. That's -- I apologize -- I don't know. That's what I have that I sent to the agency. I apologize. I don't know. That's ...

Q. So you have one in 2021 that is not on the CV that you provided to the --

A. Yes. And last summer as well, yes.

THE COURT: Do you want me to take a recess --

THE WITNESS: I can --

THE COURT: -- and see if she can pull up her current CV?

MS. BALES: No, Your Honor.

THE COURT: I mean, I know sometimes we store them and get more than one CV and --

THE WITNESS: Yes.

THE COURT: I'm wondering if she sent in the wrong one.

MS. BALES: Which would mean that the incorrect one was disclosed to us.

THE COURT: Right.

MS. BALES: Okay.

THE COURT: Do you want me to see -- I mean, whatever you want me to do.

MS. BALES: I believe she testified that she reviewed it and it was accurate --

THE COURT: Okay.

MS. BALES: -- the CV that was presented to the Court.

THE COURT: If you want me to leave her on, I will. I just didn't know if you wanted access.

MS. BALES: I just would like to know how many omissions there are from the CV, is what I'm getting at.

Q. How many presentations did you do in 2022, ma'am?

A. 2022?

Q. Yes.

A. None.

Q. Okay. And 2023?

A. None.

Q. And 2024?

A. None.

Q. Okay. And you're sure about that?

A. Yes.

Q. Okay. So when you testified earlier that you've done several presentations recently, that would just be one in 2025?

A. I don't know that I said --

MR. AYERS: Objection, misstating testimony.

THE COURT: I'm sorry. We've had an objection. When we have -- when the lawyers start talking over you that means someone is probably making an objection. And just pause a second.

THE WITNESS: Uh-huh.

MR. AYERS: The objection was a misstatement of testimony.

THE COURT: Okay. It's cross examination, I'll let her ask, continue to ask.

Q. Okay. So one presentation in 2025; is that correct?

A. That's correct.

Q. And then we jump to 2023?

A. None in 2023, I believe.

Q. Okay. I believe you just testified that you did have some in 2023 -- or at least one in 2023.

A. I said 2021, 2019, 2013, but I don't believe I said 2023.

Q. Okay. Well, the record will reflect.

A. Uh-huh.

Q. Let's talk about professional achievements. The last professional achievement I see on your CV is from 2020, but I believe you testified differently than that.

MR. AYERS: Is there a question there, Your Honor?

Q. Okay. Would you -- ma'am, you testified that the CV that you reviewed was accurate. Do you agree that that CV is accurate?

THE COURT: Do you want to show it to

her again and give her some time to look over it? Ma'am, do you have your CV in front of you? Or can you --

THE WITNESS: I have one -- I have one in front of me, but it sounds like it's not the one that the agency sent over, so ...

MS. BALES: Okay.

THE COURT: We're going to show you the one that was sent in that was disclosed to the parties. And Counsel is going to act you whether or not this is your most recent CV and she's going to ask you whether it's accurate.

THE WITNESS: Understood.

THE COURT: Do we need to scroll down --

Q. Just professional achievements. Is that accurate? Just yes or no.

A. I'm just looking at it. So where it goes to American Nurses Association that, so far, is accurate.

Q. Okay. Scroll down.

THE COURT: Ma'am, she's also asking you if there are omissions.

A. From there, no. The only omissions would be, it looks like my presentations are not updated. This here does have the 2020 -- you said my last presentation was 2015. This does have the 2020. But this is not -- I do have

one after -- two after the 2020 that appear not to be in this version.

Q. Okay. So this is not actually accurate.

A. The most updated, correct.

Q. Ma'am, I -- one thing that I bet is accurate on this CV is that you state you're especially passionate about educating folks on best practices for gaining venous access. Is that a fair statement?

A. Yes.

Q. Okay. And you're familiar with -- I believe you mentioned this earlier. You're familiar with the Infusion Therapy Standards of Practice; is that correct?

A. That's correct.

Q. And, in fact, you're on the Peer Review Panel for that?

A. Correct.

Q. And you reviewed these standards in preparing your statement -- your report?

A. Correct. Correct.

Q. And it's an evidence-based document; is that correct?

A. That's correct.

Q. Okay. And the Standards of Practice state that vascular access requires clinical experts; is that correct?

A. Correct.
Q. And the reason for that is that gaining peripheral access is invasive; is that correct?
A. Yes.
Q. And it is a high-risk endeavor; is that correct?
A. That's correct.
Q. Okay. So gaining venous access is a high-risk endeavor, that's correct?
A. Yes.
Q. Okay. So the standard that says education alone is insufficient; is that correct?
A. Yes.
Q. A practice for gaining venous access that just relied on education is insufficient; is that correct?
A. If by education we mean just not hands-on, then yes.
Q. Okay. So you guessed my next point. The Standards of Practice require observed clinical competency; is that correct?
A. That is correct.
Q. And it requires ongoing training; is that correct?
A. Yes.

Q. And the Standards of Practice state that the competency of a person who is going to gain venous access should be routinely assessed?

MR. AYERS: I'm going to object to this line of questioning insofar as it's a back door to try to get to the qualifications of the physician.

MS. BALES: Your Honor, we had testimony about the training. And Commissioner Thomas testified that she confirmed their licensure and that they had 20 years of experience. This is about the people who will gain IV access and the fact she's -- the fact that she's an expert in an area, that this is like her core expertise, and she recommends that a 20 --

THE COURT: I can't rule in your favor until you stop talking.

MS. BALES: Okay. Thank you, Your Honor.

THE COURT: All right. I'm going to overrule.

Q. So the competency of a person who is going to insert an IV should be routinely assessed; is that correct?

A. That's correct.

Q. For example, if a clinician makes two attempts at gaining venous access --

MR. AYERS: Objection. This is getting into physician again, Your Honor.

MS. BALES: Your Honor, I think he doth protest too much. This is clearly about the IV access team. I'm asking her --

THE COURT: Well, ask about the IV access team --

MS. BALES: Okay. I'll be sure to --

THE COURT: I thought you used the word physician.

MS. BALES: I think I said clinician.

THE COURT: Oh, maybe I misheard that.

MS. BALES: I'll use -- I'll preface -- I'll --

THE COURT: I'll let you move on with clinician, as long as it -- I didn't hear physician.

MS. BALES: I understand.

Q. A person who -- an IV person who is attempting to gain IV access, after two attempts, the Standards of Practice say they should ask someone else to do it; is that correct?

A. That's correct.

Q. And the reason for that is there is a risk of complications after two attempts; is that correct?

A. Partially correct, yes.

Q. Okay. Well, what the Standards of Practice says. We could pull it up if we need to.

A. Uh-huh.

THE COURT: And that's a standard of practice?

MS. BALES: Yes, Your Honor. That's the Infusion Therapy Standards of Practice document that she relied on in preparing her report.

THE COURT: So that's a standard of practice for well care people?

MS. BALES: Well, it's --

THE COURT: Is it the standard of practice for executing people?

MS. BALES: No, it's not. It's the standard of practice for gaining venous access, which is what her expertise is in.

THE COURT: Okay. But there's a distinction, isn't there? Is there a standard of care for peripheral IV access if the intent is to cause the death of someone?

MS. BALES: Your Honor, there is. If there are not -- if there are no standards or if they are unreliable standards for gaining -- for the IV team to gain IV access, that increases

Ms. Pike's risk of added --

THE COURT: No, no, I didn't mean that. I said is there like an organization that has standards for the quality and level of training for people to gain peripheral access -- peripheral IV access when the intent is to cause the death of an individual? I mean, because any complications that might arise, you know, down the road from -- wouldn't be applicable in a situation where the person is going to be dead.

MS. BALES: Your Honor, the complication of extravasation would be applicable in --

THE COURT: So there's some that would, but some --

MS. BALES: Yeah.

THE COURT: -- might not -- okay. But you're talking about the standards that you would use in a hospital setting or when the patient -- the goal is to preserve the health of the patient?

MS. BALES: I believe she testified, based on her experience, she made a recommendation for how to administer the lethal injection chemicals. That's what I'm getting at. She relied on this document to give this recommendation --

THE COURT: Well, I'm going to let you

go forward. I was just seeking clarification about the standards.

MS. BALES: Okay.

Q. The Standards of Practice emphasizes that peripheral IV access should be gained by people who have clinical knowledge and skills; is that correct?

A. Correct.

Q. Okay. The Standards of Practice state that a patient self-report is the most valid and reliable indicator of pain; is that correct?

A. Would you repeat the last word, please?

Q. The Standards of Practice states that a patient self-report is the most valid and reliable indicator of pain; is that correct?

MR. AYERS: Objection. I'm going to ask that she be given a chance to look at these Standards of Care to answer these questions about what they contain specifically.

MS. BALES: Happy to do that, Your Honor.

THE COURT: I assumed she had it in front of her.

MS. BALES: Well, we can -- do you have a copy of the -- ma'am, do you have your copy with you of the Standards of Practice?

THE WITNESS: I can pull it up.

MS. BALES: Okay.

THE WITNESS: I can pull it up.

MS. BALES: Okay. Well, we'll use that. I think that will be quicker. I'm almost done with the Standards of Practice, by the way.

THE WITNESS: Okay. I have my Standards document. Could you let me know what page we're on or where we are?

THE COURT: Ma'am, they've posted a copy on the link here. Is that you have or do you have a different copy from --

THE WITNESS: I have -- the one that's on this screen right now, that's what I have. That's the latest version, the 2024 standards.

THE COURT: She's going to call your attention to specific pages, I believe.

THE WITNESS: Right. Okay.

MS. BALES: Okay. Can you go to PDF page 107?

Q. Ma'am, we're going to PDF page 107 out of 291. It might be quicker ...

MR. AYERS: How does that corresponds to these pages?

MS. BALES: I can call that out also.

Q. Okay. That is page S45.
A. S45?
Q. Yes. I'm calling that the -- I guess the paper document pages out for Counsel, but we can also look at the PDF number.
A. Okay. Sorry, I'm just pulling it -- I'm trying to get to that page S45.
MR. AYERS: This is S101.
MS. BALES: Pardon?
MR. AYERS: This is S101.
MS. BALES: Is that --
MR. AYERS: On the bottom right on this one.
MS. BALES: I know. They're different. It's confusing.
THE WITNESS: Let's see, S60 --
MR. AYERS: That's a different page.
THE WITNESS: Okay. I believe we're here.
MS. BALES: Okay. Hang on. I -- would you go to S107, please.
THE WITNESS: I'm sorry, you said S45; is that correct?
MS. BALES: I apologize. I got a little sideways working with the different numbers.

THE WITNESS: Uh-huh. Okay.
MS. BALES: I'm at S107.
THE WITNESS: Okay.
Q. S107 on the right side, paragraph C.
A. Okay.
Q. The Standards of Practice says that you should use pain relieving measures to reduce insertion-related pain; is that correct?
A. I'm just going to pull it up. Sorry. Let me see. Yes, it does say that.
Q. Okay. If we could go to S101. Paragraph D, subpart 5, so you'll need to scroll -- scroll beyond some so we can paragraph 5.
A. Okay.
Q. The Standards of Practice provides that a patient self-report is the most valid and reliable indicator of pain; is that correct?
A. Correct.
Q. Ma'am, I'm going to switch to your report now.
A. Okay.
Q. In your report you state that you reviewed Ms. Pike's record -- medical record; is that correct?
A. Yes, regarding her -- the phlebotomy

access.

Q. And how many pages of records were you provided?

A. I don't know how many -- the number of pages. I was -- looked at the phlebotomy records.

Q. And how many pages of phlebotomy records did you review?

A. I don't know the number, how many there were, the number of pages.

Q. Do you know how far back -- or the period of time for the records you reviewed?

A. I don't off the top of my head, no.

Q. Okay. So -- but your -- your report says there's no documentation that Ms. Pike had difficult access. That's in your report.

A. From what I read, there was no indication of difficult access.

Q. Okay. I'd like to talk about the 23-gauge needle.

A. Yes.

Q. Is it your testimony that a 23-gauge needle is commonly used in minor run (phonetic) blood draw? Or you said it's very commonly available. Is that your testimony?

A. Yes, it's commonly used in phlebotomy

daily.

Q. But that would be in a hospital setting; is that correct?

A. Not just hospital. Clinic, home care ...

Q. Okay. But it's -- I believe you said it's most commonly in a hospital setting.

A. That I said that?

Q. I -- you mentioned it's very common in a hospital setting.

A. I don't know that I said in a hospital setting. But it's a very commonly used needle for phlebotomy.

Q. And is it your testimony that it's used when it's not necessary?

MR. AYERS: Objection. Vague.

THE COURT: I'll let you rephrase the question. The question --

Q. Okay. You said that the 23-gauge needle is used commonly?

A. Yes.

Q. Did you testify that it's used to make access more comfortable?

A. It can be used to make access more comfortable. I can explain further if you'd like.

Q. Okay. Is it used every single time for a

patient when it's not necessary? Have you encountered that situation?

MR. AYERS: Objection. Foundation as to what's necessary.

THE COURT: Talk to her about necessary. I mean --

Q. When is it necessary to use a small-gauge needle?

A. So that particular needle, the butterfly needle, is actually very commonly requested by patients for their phlebotomy --

Q. And that's your testimony --

A. -- procedures.

Q. And that's your testimony under oath is that patients commonly request that?

A. Request a butterfly? Absolutely.

Q. That's your testimony under oath?

MR. AYERS: Objection. She's answered this question twice now.

THE COURT: Yes.

Q. Is it the practice that whatever the patient asks for the phlebotomist does?

A. Very frequently, yes. And the nurse does, as well.

Q. Okay. They let the patient dictate

their --

A. If it's within reason, absolutely.

Q. Okay. So we know that a 23-gauge needle is going to be slower; is that correct?

MR. AYERS: Objection. Foundation.

THE COURT: I'm sorry -- I'm going to overrule.

Q. Ma'am, a 23-gauge needle, the fluid moves through a 23-gauge needle at a slower rate; is that correct?

A. At a slower rate than a 21, but a faster rate than a 23. Yes.

Q. Okay. A 23-gauge --

A. I mean a slower rate than a -- 21, 23, and -- yes, it moves slower than a 21-gauge. Sorry.

Q. Okay. So, it moves slower than other commonly available needle sizes?

A. For phlebotomy purposes, yes. And for infusion purposes, yes.

Q. A 22-gauge is commonly available?

A. A 22-gauge is an IV catheter.

Q. Okay.

A. That's not a phlebotomy needle.

Q. How about a 20-gauge?

A. A 20-gauge is also an IV catheter. Those

aren't used for phlebotomy.

Q. A 21-gauge?

A. A 21-gauge is a phlebotomy needle. That's a butterfly. I'm not an expert on the -- there are two types of needles that are used for phlebotomy. There are the butterflies, which are very commonly requested. And this -- not just at my facility. I just know this in speaking with other practitioners. But there are also what they call the straight needles that some phlebotomists use in phlebotomy clinics that I don't off the top of my head know exactly what the gauges are. They're likely the same because they're odd numbers versus the even numbers for IV catheters.

Q. You would agree with me that the smaller the needle the slower the blood draw will happen?

MR. AYERS: Objection to the relevance of further questions about phlebotomy. This is outside her area of IV access expertise. The reason phlebotomy was an issue is the medical records, not what is the standard of care, what happens in phlebotomy generally.

MS. BALES: Your Honor, she's drawing an inference that there's absolutely no reason to use a 23-gauge needle as reflected in Ms. Pike's records. And I'm trying to understand how she got

to that conclusion.

**THE COURT:** I'll give you some leeway, but you're probably getting close to ending this, so -- I'm going to give you some leeway here.

**MS. BALES:** Okay. I'll ask my last question then.

Q. Would you agree -- related to that topic, would you agree that the smaller the needle the slower the fluid travels through it?

A. Yes.

Q. Thank you.

**THE COURT:** I don't want to beat a dead horse, but haven't we had about four experts that have said that already?

**MS. BALES:** Well, we have. I'm trying to understand the basis for her opinions, Your Honor.

**THE COURT:** Okay.

Q. On page six, we've got your -- you've got your conclusion.

A. Okay.

Q. And your conclusion is that placing a peripheral venous catheter utilizing a 22-gauge or larger would allow the infusion to be given in the most humane way possible?

A. Yes.

Q. And that's based on your years of experience and based on using the standards of practice that we discussed; is that correct?

A. That the 22-gauge or larger because I was asked originally to discuss the 23-gauge butterfly versus --

Q. Ma'am --

A. I'm sorry?

Q. -- you're recommending a 22-gauge or larger; is that correct?

A. Yes.

Q. And your opinion, your declaration is that that would allow a humane infusion; is that correct?

A. Correct.

Q. Ma'am, your declaration states that you reviewed the protocol; is that correct?

A. Yes.

Q. Okay. And the protocol has a section on the IV team; is that --

A. Yes.

Q. Does the section on the IV team have any requirement for -- does it have any requirements for education?

<u>MR. AYERS:</u> I'd ask the witness be shown the protocol to refer to if she's going to be

asked questions --

<u>THE WITNESS:</u> Yeah, please.

<u>THE COURT:</u> Okay. Can you put up the protocol for her?

<u>MS. BALES:</u> Your Honor, we need just a minute.

(PAUSE)

<u>MS. BALES:</u> We're getting it up on the screen, ma'am.

Q. Okay. That number one, on the top section, did you review that?

A. Yes.

Q. And do you see the sentence that says all team members are currently certified, licensed, and/or qualified?

A. Yes.

Q. Okay. So we have no way of knowing if that includes education, do we?

A. Well, if they're certified and licensed, to me that would say there was education.

Q. Okay. Fair enough. We don't know what their clinical --

A. Correct.

Q. -- education is? Would you agree we don't know if they've demonstrated competency?

A. By that paragraph, I do not know.
Q. Okay. We do not know if they've practiced IV insertions, do we?
A. Well, it says they're currently certified, licensed, and/or qualified to place IV lines.
Q. But that doesn't mean that they have been -- we don't know what they're using to determine qualified, do we?
A. Specifically by this paragraph, no.
Q. In your recommendation for how to administer the lethal injection chemical, you recommend a 22-gauge; is that correct?
A. I believe I recommended a 22-gauge or larger. And to compare -- I was comparing the 23-gauge steel needle.
Q. Okay.
A. But yes, a 22 or larger, yes.
Q. Would there be any reason or how -- would there be a reason for there to be 24-gauge in the execution chamber?
MR. AYERS: Objection. This is outside the scope of her expertise. She's not a correctional expert.
MS. BALES: Well, there was testimony that there is a 24-gauge needle in the execution

chamber and presumably there's a possibility of intention to use it. So I'd like to elicit testimony from her --

THE COURT: I'll let you ask the question.

Q. Do you recommend a 24-gauge?

A. I -- so I always have everything available -- all different sizes available to me based on the patient. A 24-gauge is a very small catheter and it's typically used in children and babies. I don't off the top of my head know the infusion rate of a 24, but it would be fairly similar to the 23-gauge butterfly as far as the infusion rate. It would be safer and have a less -- less of a chance of extravasating or puncturing through the vein because it's not -- we're not leaving a steel needle in site, but it's a very tiny catheter.

Q. How much pressure would it take to use that 24-gauge?

A. I'm sorry?

Q. How much pressure would have to be applied to use that extremely small 24-gauge needle?

MR. AYERS: Objection. Foundation as to what would be delivered through it and how much fluid.

MS. BALES: Okay.

THE COURT: Well, I was going to -- before he objected I was going to say the question doesn't make any sense. Can you rephrase the question?

MS. BALES: Okay. Thank you, Your Honor. That's helpful information.

Q. In the execution chamber, there is a 24-gauge needle offered as one of the options. And you just testified that it would go slow, but might be -- what was your testimony about the 24-gauge?

A. It's a very small needle. It's typically used for pediatrics or neonates. I would have to look up what the infusion rate is, but it would be safer than the 23-gauge steel needle as far as being more stable and not causing issues with the vessel, but it would not be as -- the infusion would not be as quick as with the 22 or larger.

Q. Are you aware of how much pressure is applied to push the fluid through a 24-gauge?

THE COURT: I have the same problem. The question doesn't make sense because -- pressure -- pressure to get a certain amount of fluid. Do you want to get just a tiny bit of fluid very slowly, then you probably could have less pressure. If you want to get a certain amount of fluid in in a certain amount of time, you could have greater

pressure. So when you ask a question about how much pressure, that doesn't really get to what you're really wanting to ask.

MS. BALES: Okay.

THE COURT: And it's vague because it, by itself, doesn't make any sense. Am I making sense?

MS. BALES: Okay. I understand, Your Honor.

THE COURT: Okay.

Q. Ma'am, in your conclusion you testified that using a 22-gauge or larger would allow the infusion to be given in the most humane way possible. And I -- you've reviewed the protocol; is that correct?

A. Yes.

Q. We're going to pull up the page in the protocol that talks about the amount or the quantity or the volume of the injection.

MR. AYERS: At this point, I would object to the relevance of this line of questions. She has not testified that she believes a 24-gauge needle is appropriate. If she had, perhaps this might be relevant to determine what the pressure would be. But this is not an issue that is ...

THE COURT: Is this going to take a lot

longer?

MS. BALES: Your Honor, I'm trying to understand -- she has made a very serious recommendation. And I'd like to get to the bottom of that.

THE COURT: All right. I'll give you some leeway.

MS. BALES: It's very important to Ms. Pike's issue.

Q. Okay. That's what the infusion -- what you're calling an infusion, that's what's going to be injected?

A. Right.

Q. And do you recommend a 24-gauge needle for that?

A. Do I recommend a 24-gauge needle for that?

Q. Yes, in your experience.

A. I don't know that I would use a 24 for that. I would use a 22 or larger.

Q. And why is that?

A. Because of the amount of time it would take.

Q. It would take a longer period of time?

A. Yes. I believe -- I had a chart, I

believe, of different -- from my 22s up to 18s. So a 23 would be fairly similar to the 24. I don't have the 24 -- I did not do -- I did not include the 24 because again it's more of a -- it's a smaller catheter, it's a smaller needle. So I was looking more to compare the original proposal of the 23-gauge phlebotomy needle with what would be standard catheters.

Q. Okay. So to be clear, you do not recommend a 24-gauge for this process?

A. All things being equal, I would not. But I'm not with the patient. But I -- to do it in the quickest way -- say quickest way possible, I would not necessarily use a 24.

Q. Okay. Thank you. One more question. What is extravasation?

A. Extravasation is the inadvertent infusion of a vesicant medication into the tissue versus in the vessel.

MS. BALES: Can we go to page S257. And I apologize, I don't have the PDF number for that.

Q. Okay. Ma'am, we're pulling up the extravasation staging --

A. Yes.

Q. -- chart about that.

A. I'll have to pull up the standards

again. I closed them to move to the --

Q. We're getting it up. I -- we're just taking a little ...

MS. BALES: And if you could scroll down so the top half is visible. Are you able to enlarge it?

Q. Okay. So in stage four, the last factor that you look at, can you read that?

THE COURT: Do you want her to read it aloud?

THE WITNESS: Yes, I can see it.

Q. Okay. So that --

A. Oh --

Q. For the record, one of the factors for stage four extravasation staging is skin breakdown including blistering or necrosis; is that correct?

A. Correct.

Q. Okay. Are you familiar with pentobarbital?

A. I have not used it. I know that it's a vesicant.

Q. You know that it's -- pardon? You know that it's a what?

A. It's a vesicant which can cause extravasation.

Q. Okay. Thank you. And the larger the quantity, the larger the possible blistering or necrosis; is that correct?

A. That would be correct. But the extravasations happen in stages. We don't normally jump from a no extravasation to a four, if that makes sense.

Q. Okay. But you do agree that pentobarbital can cause burning?

A. It could. If it leaked into the tissue, it could.

Q. And a needle that's too big could tear the vein; is that correct?

A. I'm sorry?

Q. If the IV team in Ms. Pike's call --

A. Uh-huh.

Q. -- uses a needle that is too big, it could tear the vein; is that correct?

A. Could tear the vein?

Q. Or damage it?

A. It could potentially damage it. It depends on the size and the size of the vessel.

Q. Okay. So, but that is something you agree is possible if a needle that's too big is used?

A. If the catheter that is too big is used, it could take up too much space in the vessel, thus not

allowing for enough hemodilution that could cause some issues with the vessel, yes.

Q. And if some issues with the vessel happen, the pentobarbital could leak out of the vein; is that correct?

A. It's possible, yes.

MS. BALES: May I have just a moment, Your Honor?

THE COURT: (No audible response).

(PAUSE)

MS. BALES: Your Honor, no further questions.

THE COURT: All right.

MR. AYERS: No redirect, Your Honor.

THE COURT: All right. Do you have anymore witnesses?

MR. AYERS: No, Your Honor. That concludes the State's proof.

THE COURT: All right. Any rebuttal?

MS. BALES: Your Honor, may we have just a moment to discuss?

THE COURT: Okay. Why don't I take a short recess and then you can discuss that. And then if you decide you're not going to have rebuttal, why don't you get ready for our

presentations?

MS. BALES: Thank you, Your Honor.

THE COURT: If you decide, then we'll come back and take that up. Is ten minutes enough?

MS. BALES: Yes, Your Honor.

THE COURT: All right. Court is in recess.

(Whereupon, a brief recess was held, after which the proceedings continued as follows:)

THE COURT: Agree to make some kind of presentation here at the end. So I'm doing this primarily to help each side understand the thoughts of the other side so that you might address these in your findings of fact and conclusions of law that you're going to submit next week. So, relax, this is not an oral argument. This is --

MR. AYERS: Your Honor, I don't believe the cameras --

THE COURT: This is not an oral argument at all. I just want to give everyone an opportunity to briefly articulate where they think we are on each individual question that we have. Anything that you lawyers believe that you can agree on, I would appreciate knowing about that.

And then next week, you'll be submitting your findings of fact -- proposed findings of fact and conclusions of law. And then we'll be anticipating receiving the transcripts hopefully -- I believe we're going to get the transcript by the middle of next week. Does that mean you will not have it to help you with your findings of fact and conclusions of law? Okay. So, anyway, that being said, let's have our presentations however you want to present them. We'll start with the Movant.

**MR. FERRELL:** Thank you, Your Honor. And I was just prepared to go through all four of them one by one and talk about what we think has been shown.

**THE COURT:** Perfect.

**MR. FERRELL:** Okay. And the first issue is given the diagnosis of thrombocytosis, attempts to achieve peripheral IV access under the current protocol are sure or very likely to cause serious illness and needless suffering.

All of the experts in this case agree that Christa Pike suffers from essential thrombocytosis. They agree that thrombocytosis is a condition that produces excess platelets in the blood and that excess platelets can lead to

clotting. This increases her chances of suffering during an execution under the current protocol.

Dr. Mansour testified that any risk is not implicated until the platelets reach into the one millions. Dr. Van Norman explained that the longer a person has thrombocytosis the greater the risk of microvascular complications and clotting. Repeated blood draws during the management of thrombocytosis can make the veins more fragile and more prone to rupture. Dr. Van Norman also testified that thrombocytosis increases the risk of clot in an IV line.

Dr. Zivot, who is a board -- who is Board certified in critical care and anesthesiology and has treated patients with thrombocytosis and has experienced managing the care of critically ill patients with coagulation issues testified that Christa is at increased risk of clotting and paradoxically excess bleeding during the execution because excess platelets can consume a critical blood clotting protein.

Dr. Zivot explained -- based -- explained that based on his review of inmate autopsies that lethal injection by pentobarbital causes pulmonary edema, which is blood and other

fluids in the lungs. He confirmed that the autopsies of two Tennessee inmates executed under the current protocol both had pulmonary edema. He explained that it's an extremely painful condition characterized by a sense of drowning and burning and also explained that pulmonary edema, which can only happen if the patient is breathing and blood is circulating, happens while the patient is alive. And it's unclear whether the patient is unconscious, insensate, or conscious and sensate. And we just don't know the answer to that question. Dr. Zivot explained that Ms. Pike's thrombocytosis increases the risk of clotting in the IV sites and along the IV lines.

Dr. Mansour testified that he would not rule out this risk, but that her elevated platelet levels were not concerning to him. However, I think it's important to remember that Dr. Mansour had reviewed a limited number of the medical records provided by the State concerning Christa's thrombocytosis and platelet counts, that there were a number that either he did not review because he did not receive them or he overlooked them in his review process.

Dr. Mansour testified that two percent

of the population have platelet levels exceeding 450 up to approximately 525. However, the records that were provided to him show that Christa -- Ms. Pike's levels have exceeded that figure. And he did testify that that wouldn't change his opinion. But I think that that's important that those excess numbers are there.

As to the second issue that has been referred to this Court. Number two, that --

THE COURT: Let me interrupt you for just a second.

MR. FERRELL: Oh, I'm sorry.

THE COURT: Just a second. I'm not telling you how to -- are you going to come back to the first issue and tell me what the conclusion of law should be from these facts? Or are you just giving me your view of the facts?

MR. FERRELL: I was just planning on giving the view of the facts.

THE COURT: So you're not going to get into --

MR. FERRELL: I could, yeah. I think we got the instructions and I'm not sure I, you know --

THE COURT: Well, the Court has to send

in finding of facts and conclusions of law on each -- just on the narrow questions.

MR. FERRELL: Right.

THE COURT: So, I'm not telling you -- if you want to limit it to facts, that's fine.

MR. FERRELL: And I think that there are some -- I won't say that my entire presentation is limited to facts.

THE COURT: Okay. Just --

MR. FERRELL: But --

THE COURT: I'm going to keep my mouth shut. You go where you want to go with this. This is to benefit Counsel as much as it is to benefit me, so ...

MR. FERRELL: Okay. Thank you, Your Honor. And I do --

THE COURT: And --

MR. FERRELL: -- believe that the conclusion of law is that increased likelihood of serious illness and needless suffering does increase the possibility that given the Defendant's -- or the inmate's presentation with thrombocytosis, there is a marked increase in the possibility that insertion of IV's and injection of pentobarbital will be more likely to either be

difficult to achieve because of the compromised veins here or more likely to result in a blowout as some of the experts testified to and that that does increase the likelihood that an Eighth Amendment violation of cruel and unusual punishment will happen during the process of a lethal injection under the current protocol, given her diagnosis of thrombocytosis and the long history of blood draws she's had. And I know that gets more into the small and compromised veins. But the thrombocytosis itself will affect how the pentobarbital achieves or should achieve her execution.

All right. Number -- the second issue is given Ms. Pike's cited history of sexual assault and asserted diagnosis of post-traumatic stress disorder, PTSD, whether the movement of Ms. Pike to Riverbend Maximum Security Prison before the execution where she would be observed by male prison officials for two weeks prior to the execution would make it sure or very likely that the challenged protocol will cause Ms. Pike serious illness and needless suffering.

Now, obviously at the beginning of this hearing, we kind of established that there were

some misunderstandings in how the issue may have been presented or understood, but that Ms. Pike will not spend two weeks at Riverbend. Under the protocol, she will be under close observation at DJRC and according to the State she will not be transferred to Riverbend Maximum Security Prison any less than 24 hours -- any more than 24 hours before the scheduled execution. So that, the factual premise is a little different than in the question presented to Your Honor. But both parties agree that that is the case.

THE COURT: I guess I have to answer the question, but I guess what I'll probably do is answer their question and then answer a redrafted similar question. And I guess that question should ask whether the observation for two weeks prior to the execution and movement to Riverbend Maximum Security Institution 24 hours before --

MR. FERRELL: And it would be my contention -- and we haven't conferred on all of this, but that we would inform the Court and probably both sides would do the same, but it's our understanding and our agreement, like you just asked, what things do we agree on. This -- we can agree that the protocol sets out one process, but

the State has made agreements that I think are better for our client and therefore we're certainly not going to object to those changes. And I believe we've come to an agreement that she would be transferred not more than 24 hours, and that is when she would be at Debra -- or at Riverbend.

**THE COURT:** Well, we'll address that question for them, but assuming they need the answer to that question, I think that's a legitimate -- that's (inaudible).

**MR. FERRELL:** Yeah. I think the testimony of Dr. Bethany Brand, whose testimony was unrebutted about Christa Pike's psychological diagnoses and history of sexual trauma is the most important among this issue. Dr. Brand, a clinical psychologist and a specialist on the impact of trauma, testified concerning Christa Pike's history of sexual assault that began when she was a preschooler and lasted throughout her childhood.

Dr. Brand testified that Christa's sexual abuse began when she was just a preschooler and unfortunately continued throughout her childhood. She was raped again -- after the childhood incidents, raped again at age 11 and

raped once again at age 17. In addition, some of her mother's boyfriends committed -- at least one committed sexual assault on her by touching her in a sexual way and she was exposed inappropriately to a vast amount of sexual material. And that last rape at age 17 occurred almost exactly one year before the crime in this case.

Ms. Pike was also physically abused in childhood, which along with the sexual abuse leads to that diagnosis of post-traumatic stress disorder. And Dr. Mansour -- Dr. Brand graphically chronicled how PTSD is likely to affect Ms. Pike at the time of her execution under Tennessee's current lethal injection protocol. And I begin with the close observations that in our understanding of the facts will happen at the Debra K. Johnson Rehabilitation Center. And according to Dr. Pike (sic) this will be triggering to have her observed in all of her activities every ten, fifteen minutes. It will -- that observation -- that close observation will be triggering to this survivor of serial rape because of the loss of bodily autonomy in the last few days.

Now, the warden testified here that the

goal was to staff all observers with only female staff. The State doesn't guarantee this, but they do say that they will strive to have only female staff observing her. However, according to Dr. Brand, while men observing her would be much worse, women observing her in all of these close and personal and intimate activities is still going to be triggering for someone with this history of sexual assault. But if they're able to achieve only women observing her, I think that Dr. Brand admitted that the impact of that triggering would be lessened during the observation period.

But regardless, she will be moved. Christa Pike has spent the last 30 years in one unit of one prison, except for very short trips out either for medical reasons or for a court hearing. But it's important, I think, to understand that her world is that very small one-unit place in a women's prison. She will be transferred in the last 24 hours of her life to a men's prison that she's never been to before into a setting that's completely different and with guards and observers that are unknown to her. And that's certainly going to -- and that's certainly

going to -- and that would happen regardless, but given her history, that's going to be traumatic.

The part of the process that cannot be ameliorated is the most traumatizing for her. The lethal injection protocol requires that Christa be placed on a gurney and strapped down before the IV team works to achieve venous access or if they're unable to, to possibly set a central line because of her small and compromised veins. This process may last longer than it does for other inmates. Dr. Brand testified that it is very likely to cause Christa Pike to relive her past sexual trauma of being raped, experiencing those rapes all over again as the State inserts lines into her to bring about her death.

Because of this traumatic injury -- because of her traumatic history as a serial victim of sexual abuse, Christa will involuntarily experience this super added terror and psychological pain as the State executes her. Your Honor, that super added pain and that terror and torture violates the Eighth Amendment. And it's what Christa Pike presents with against her own will. It's not like she manufactured these events and it's not like she's consented to them. These

things happened to her and will cause her to be tortured at the time of her execution, however long it takes to get a line established and to get the drugs flowing while she's strapped to this gurney surrounded by staff and unable to move.

The third issue, given Ms. Pike's allegedly small and compromised veins, whether achieving peripheral access pursuant to the current lethal injection protocol would make it sure or very likely that the challenge protocol will cause Ms. Pike serious illness and needless suffering.

Dr. Van Norman is an anesthesiologist with over 30 years of clinical experience. She has placed thousands of peripheral IVs and thousands of central lines. She reviewed Ms. Pike's medical records and found multiple risk factors for difficult peripheral IV access, including her obesity, her scarred veins from repeated blood draws, her thrombocytosis and her apparent small veins indicated by the use of a 23-gauge needle for blood draws. She also noted that most of the blood draws are from Ms. Pike's hand, which is a painful place to draw blood. And therefore the hand is only used, typically, when larger veins

are unavailable. And we have, as indicated with the last witness, no information on the education and experience of the execution personnel. The witnesses that -- I think one of the disconnects in some of these proceedings is that all of our medical experts practice in clinical settings where, as you said and in your questioning with the nurse, the goals are completely different. And the practices and the availability of expertise is probably very different.

The facts that some of the experts, such as Dr. Mansour or the nurse at the end, talk about don't present problems are because they are in a clinical setting where they do this work all the time. And we have no knowledge, although what we have are the qualifications listed in the protocol, that do not include people like Ms. Campbell who are experienced, vascular nurses that do this work all the time. Therefore the fact of Christa Pike's small and compromised veins is a little different in the execution chamber. And that will cause the venous access to be more difficult, potentially prolonging the time needed to achieve that and prolonging the time which she may be in the terror of her sexual abuse.

Dr. Van Norman also explained that if too large a needle is used it can cause the vein to tear. If too small a needle is used, there is a significant risk the vein will rupture because the fluid will exit the needle at an exponentially higher rate. This can lead to extravasation, which has been testified to by many of our witnesses. And the extravasation of pentobarbital will not only reduce its intended impact, but also create an extremely painful burning sensation. Dr. Van Norman compared it to Drano, that it's that caustic and it can cause significant burns. This would not only prolong her death because the drugs aren't getting where they need to be, it will also make it more painful because they will be -- the drugs will be burning the tissue around her veins. So, it's any unsuccessful blowout or any of those complications have a very strong risk of making this a much more torturous process.

And because Christa Pike presents with veins that have been drawn on many times and that are difficult to access, once again, is not something that she can control. It's something that she presents with and that the State may or may not be, because we don't really know the

qualifications, be able to reduce her pain and suffering. But there is certainly an increased risk of pain and suffering.

Now, Dr. Mansour testified that he'd be less worried about Ms. Pike's thrombocytosis if the IVs were set in her elbow veins. But that kind of begs the question of why are they doing draws in her hands, which is more painful, if the elbows work. Now, I heard Nurse Campbell say that one of the times -- I think it was one, I'm not sure if I get it right -- but that most were in her hand. That's what the records indicate.

And finally the fourth topic of factual inquiry for this Court is whether Ms. Pike's proposed alternative methods of execution would significantly reduce a substantial risk of severe pain. Ms. Pike had advanced two alternative methods for carrying out her execution besides the present lethal injection protocol as written that the State of Tennessee has adopted. These would be for the State to recognize the difficulty the execution team will have in placing two patent peripheral IV lines and instead administer pentobarbital directly through a central line that would be placed by a physician competent to

perform the task at the time of her execution.

This alternative -- and I know the State quibbles about whether it's an alternative method, but I do believe the United States Supreme Court, the spirit of what they've been looking for in proposing alternatives is for the inmate to identify an issue that may cause an unconstitutional execution and identify what its possible solution would be. So even though this isn't necessarily an alternative method in that it's still lethal injection, it's still following the spirit of the United States Supreme Court that has said capital punishment is constitutional, therefore there must be a constitutional way of carrying it out.

The alternative of starting with a central line is an alternative that makes the execution less -- less torturous and less needless pain and suffering that she would undergo. And it's not -- if time is part of the problem while she's strapped down and being executed -- which I believe Dr. Brand's testimony establishes that time is a problem. And I think most of us would understand that anytime someone is laying there has got to be an awful amount of time.

Given the fact that she has difficult veins, given the fact that this may be a protracted period of time, the placing of a central line is an alternative that is -- that would lessen that time and is available and easily implemented. Almost all of the doctors who testified to this Court that had experience doing central lines would be competent to do that. Now, some of them may not be willing to, but there are doctors -- as evidenced by the fact that a doctor is in the protocol, there are doctors willing to participate in executions. A doctor who is competent in placing a central line is the alternative Ms. Pike has identified. And that's readily available and easily implemented and would make this a much faster -- and I don't like using the word humane, but it would certainly lessen the pain and suffering.

Dr. Van Norman and Dr. Goldstein both testified that placing a central line involves accessing one of the larger veins, such as the carotid vein in the neck. They testified that a physician competent at the procedure would detect this vein with the use of an ultrasound. They testified that the experience a physician must

have in order to be competent at setting a central line isn't just that they have had a medical education and been trained in doing it once. The key to competence in this procedure is that they use the skill on an ongoing basis. They maintain a sufficiently frequent practice of setting a central line that their skills do not lapse.

Now, Dr. Van Norman gave us an example of what her hospital requires as competence. And that's a guideline. I'm not sure that everyone -- certainly not every hospital probably has the same guidelines. But the bottom line, the central controlling factor is that the professional, the physician, have ongoing recent practice at the skill. Just like so many skills that we -- if we don't use it, we lose it. So, that's the alternative on central line.

The other alternative that Ms. Pike has proposed, because the United States Supreme Court has required in order for these suits to go forward that there be a proposal of an alternative method of execution, is hanging. Now, this other alternative has -- the testimony in this Court demonstrates that it's a very old practice. It's something that death -- execution by hanging has

been around for I think thousands of years. And certainly it has been used fairly recently, certainly in my lifetime, at least. I know I'm one of the older ones here. But it's been used in Britain up until the 1960's and more recently in the State of Washington in the 1990's. And of the two cases where someone was executed by judicial hanging in Washington, the testimony that State was able to achieve transectional -- a transection of the spinal cord, in which case death was instantaneous.

And that's -- comparing that to the strapping onto a gurney, searching for a suitable vein, inserting an IV, injecting with lethal injection, certainly would lessen the pain and suffering of the condemned inmate. And in cases where transection of the spinal cord doesn't occur, the evidence is that death by strangulation happens fairly quickly. In the one case in a medical review that was cited by Dr. Kelly, unconsciousness was achieved in thirteen seconds. I believe her testimony was up to a minute for unconsciousness. This timeframe is much less than the timeframe involved in the lethal injection process.

In addition, with hanging there is no need to strap Ms. Pike to a gurney, no need to prod and find venous access, and no need for her to lie there reliving her sexual assaults by the involuntary actions of her traumatized brain. Hanging, which is not unconstitutional and has even been mentioned by the State as a constitutional form of hanging -- or of execution is a readily available alternative that would significantly reduce a substantial risk of severe pain and torture. And in this case, that severe pain and torture as testified to by Dr. Brand is almost certain to happen.

Your Honor, those are my arguments.

THE COURT: Thank you very much.

MR. AYERS: May it please the Court, Christa Pike has not shown a likelihood of success on the merits of any of her arguments for a stay. And that is why we're here today. The Supreme Court referred five issues, now four, to this Court to help and form its determination of whether or not to grant a stay of execution so that Ms. Pike could pursue collateral litigation that may affect the method and timing of her execution.

Now, to prevail, Ms. Pike has a double burden. First, she has to establish that execution under the current protocol -- not just any protocol, not just lethal injection in general or execution in general -- presents that a risk that is sure or very likely to cause serious illness and needless suffering and give rise to sufficiently imminent dangers. And that's language from Tennessee Supreme Court case of West vs. Schofield and it's quoting the United States Supreme Court of Glossip vs. Gross.

And it's important to remember when thinking about this part of Ms. Pike's burden that speculation as to what could go wrong during an execution is not sufficient to meet that burden. Her job in this hearing was to produce scientific evidence that would allow this Court to make this conclusion that there would be a substantial risk of -- that will -- or that is sure very likely to cause needless suffering. But really, all she has done is present speculation about bad things that could happen. And we'll get into that issue by issue as we go through them.

Second, she has to show a feasible and readily implemented alternative method of

execution. And that method of execution also has to significantly reduce a substantial risk of severe pain. She also has to show the State has refused to adopt that alternative without any legitimate penological reason. Now, that's language from the Supreme Court case of Bucklew that was discussed earlier. She has not done that either. These two burdens add up to what the United States Supreme Court calls an exceedingly high bar to prevail on these kinds of method of execution challenges. And to date, no one, not a single person has ever succeeded at either the Tennessee Supreme Court or the United States Supreme Court on what Ms. Pike is trying to do today. If she succeeds, she will be the first.

Now, the standard under the Eighth Amendment which governs these proceedings is not a painless execution. That's well established. And the Eighth Amendment also does not require general anesthesia in a lethal injection execution. That's also well established. Pike has not come close to meeting her burden for any of the issues.

We'll begin with the first, dealing with Ms. Pike's diagnosis of thrombocytosis and whether or not it's going to make peripheral IV access

sure very likely to cause serious illness and needless suffering. Well, several experts testified on this issue, but only one hematologist was called. And that was Dr. Mansour. Hematologists are the sort of doctors who have expertise managing thrombocytosis, diagnosing it and taking care of patients. And Dr. Mansour testified that based on a review of Ms. Pike's medical records he saw no indication that achieving peripheral IV access was going to pose any kind of problem. He testified that based on the medical records of her platelet counts, which he was very familiar with. There was no risk -- I should say there was a low risk of any kind of thrombotic event, including clotting at the IV site. He and Dr. Antognini also testified that they saw no risk of excessive bleeding at the IV site due to thrombocytosis.

Now, opposing Counsel attempted to play a little game of gotcha with Dr. Mansour, showing him some medical records of some platelet counts that he did cite in his report. But not a single one of those platelet counts moved the needle. Not a single one of them showed, to his view as a seasoned hematologist with four years of

experience that she is at high risk for any kind of adverse interaction with IV access.

Plaintiff's experts, on the other hand, Ms. Pike's experts, cited no sources for their belief that her thrombocytosis was going to pose a risk of IV access issues. Again, Ms. Pike's burden was to produce scientific proof that she is sure or very likely to suffer severe pain as a result of this thrombocytosis. And she failed to establish that it carries anything beyond a minimal risk.

The best she could do was to rely on the testimony of Dr. Van Norman, who was testifying outside her expertise as an anesthesiologist and that with a failing track record in Tennessee execution litigation. She has simply not carried her burden here and the Court can rule today that she has failed to prevail on issue one.

Now, as for issue two which deals with Ms. Pike's cited history of sexual assault and PTSD. The State does not dispute the terrible things that Ms. Pike suffered. I think everybody in this courtroom wishes that those things had never happened to Ms. Pike. I think we all wish that we were not here today and that she was not

on death row. Certainly none of us take any pleasure in this. And so it's certainly not the State's intention to try to minimize the suffering that Ms. Pike has experienced. But that's not the issue before the Court. The issue before the Court is whether, as stated in the Supreme Court's order, is whether Ms. Pike's transport to Riverbend and observation by male guards would cause her serious suffering or sure to very likely do that.

Now, the evidence that came out on this point established that Ms. Pike will not be moved to Riverbend until 24 hours at the earliest before she is executed on September the 30th. The Department of Correction witnesses also testified that they will make every effort to staff her observation at Riverbend with female guards. No evidence was introduced to contradict these facts.

Ms. Pike's psychological expert testified at length about her opinions of what the effects of observation would be. And she testified that any close observation by male guards or by female guards would cause issues with Ms. Pike's mental health conditions. She also testified that extraction from her cell under any method of

execution would cause mental health issues.

The expert testified that the only way to eliminate these concerns effectively would be to execute Ms. Pike at Debra Johnson Rehabilitation Center immediately after extracting her from the cell where she's been housed for the past several years. But even that would require a cell extraction. That is undisputed.

And officials from the Department of Correction testified as to why this is not feasible. Executions only happen at Riverbend. There are no facilities at Debra Johnson to carry this out. So Ms. Pike's own experts' recommendations are impossible to carry out.

The Court must also consider when examining this issue that psychological harm alone is not sufficient to state an Eighth Amendment violation in this context.

It's no doubt -- no one disputes that every execution is distressing to the prisoner. But what Ms. Pike's expert failed to do is explain how any particular component of the execution gives rise to this enhanced risk of suffering as opposed to just the whole execution itself, which undoubtedly is distressing to anyone.

This theory issue too is essentially an attack on execution in general. It's not an attack on the Tennessee Lethal Injection Protocol as it's written. It's not even an attack on lethal injection generally. Ms. Pike's position here appears to be that any execution protocol would violate her constitutional rights based on her mental health conditions. That is simply not the law. And the Court also can find that she has failed to carry her burden on this issue as well.

Moving to issue three which concerns Ms. Pike's allegedly small veins. Well, there is no proof that she has small veins. It was Ms. Pike's burden to show that. She didn't. There's no pictures, there's no video. None of her experts even visited her to examine her in person. So what the Court is left with is a conclusory statement with no supporting evidence.

Still several experts examined her medical records and made their best conclusions about what those records show. And what the testimony did show is that there are at least a dozen records of phlebotomy. Twelve of those phlebotomy attempts were successful with one needle insertion and one required two attempts.

Twelve of those phlebotomy reports stated that the skin site stopped bleeding as expected and one report simply didn't answer that question.

An anesthesiologist, a hematologist, and a nurse vascular expert all testified that they had reviewed Ms. Pike's medical records and saw nothing indicating that there would be a problem achieving peripheral IV access. Those medical records contain no indication of a failed IV attempt, no indication of any other trouble with needles. So what's left is mere speculation about what could go wrong. And as the Tennessee Supreme Court just explained last week in the Hines case that is insufficient as a matter of law to state a claim for an Eighth Amendment violation. Ms. Pike cannot show a likelihood of success on this.

Now, she attempted to cast doubt on the qualifications of the IV team to place IV access. But what came in, in fact, was that members of this IV team are currently certified to place IVs in the State of Tennessee. That was verified very recently by Assistant Commissioner Thomas. She personally verified that each member of the IV team has decades of experience placing IVs. And that is the single most important criteria cited

by one of Plaintiff's experts as to whether or not someone is going to be able to achieve IV access.

More than that, there were no studies citing -- cited indicating that small veins is even a recognized medical term. And there's no evidence that repeated IV attempts, even if they're necessary, would constitute anymore than the average discomfort tens of thousands of people experience every day in clinics and hospitals across this country. This utter failure to adduce any evidence to show anything more than a possibility of pain due to peripheral IV access dooms this claim.

Lastly, issue four -- and this is a particularly significant issue because as I stated at the beginning, Ms. Pike's burden under the law is to also establish a feasible and readily available alternative method of execution. If she cannot do that, she cannot succeed on any claim before this Court or before the Supreme Court.

And Ms. Pike failed rather spectacularly to carry her burden on this point. She abandoned the 23-gauge butterfly needle wisely after her own expert in the reports declared that it would require a tremendous amount of pressure to push

the amount of fluid through it that would be required and then it could result in complications.

Her own experts also foreclosed any idea of a central line alone as a method because they testified that it's relatively dangerous in Dr. Van Norman's words. And Dr. Goldstein testified that the risk of complications is significant and that the nature of those complications is severe, including organ damage and life threatening arterial bleeding. There's no testimony that these kinds of complications would arise from peripheral IV access.

And that leaves hanging as the only possible alternative that Ms. Pike could prevail on. If she couldn't achieve that in this hearing, all of her claims are out the door. And yet her only expert on this topic was utterly unqualified and unprepared. He based his expertise on a report that stated in bold letters in a disclaimer that AI had been used to write it. Or actually that was an article that he had authored. He could cite no source for his conclusion that hanging causes loss of consciousness in 20 to 30-second -- in the 20 to 30-second range. The Court gave him multiple

opportunities, several minutes to peruse the documents he had reviewed and he came up with nothing. All he did was write a book report, and a failing one at that.

Now, what the experts did agree on is that hanging is an unpredictable way of causing death. In other words, when someone is tied to a rope and they're dropped, no one quite knows how they're going to die. Their head could be taken off, their spinal cord could be snapped, their arteries could be cut inside their neck, or they could just hang there strangling to death. Now, both experts testify that if it's done right, hanging can be instant. But it's not always done right. And it's not easy to do right. And there's been no evidence presented that Tennessee could do it right. There's no evidence that Tennessee has the expertise, the materials to carry out hanging as a method of execution.

Now, the only time frame cited in support of this method of hanging to cause unconsciousness I believe was 13 seconds. But that was based on only one case involving one individual who happened to videotape his own hanging. And that was based on an apparent loss of

consciousness as stated in the literature. That is insufficient grounds for the Court to conclude that hanging offers a substantially less painful alternative to lethal injection.

And this, of course, is even assuming that the first two methods that Pike propose even qualify as methods of execution. It was stated earlier that the spirit of the United States Supreme Court's jurisprudence on this contemplates a central line or an equipment swap or something of that nature as an alternative method. Well, the U.S. Supreme Court doesn't speak through a spirit. It speaks through its holdings. And nothing in its holdings has ever said that an alternative method of execution is anything other than a distinct way to cause death.

Now, hanging is one. But as I previously said, Ms. Pike has not carried her burden to show that hanging is a viable alternative. Now, of course, this issue hinges on a comparison, as the Court previously observed. The alternative has to be compared to the existing protocol. And what the evidence showed about the existing protocol. And what the evidence showed about the existing protocol, lethal injection by pentobarbital, is

that it produces unconsciousness within 20 to 30 seconds. Dr. Antognini's opinion on this topic was supported by scientific evidence which he was able to defend in cross examination. Unlike some of the other experts, he had actually read the reports he cited and could explain them and could explain how they related to his conclusions. He also testified that after that 20 to 30-second timeframe the inmate will be incapable of feeling pain.

And Plaintiff's experts had no reliable scientific evidence of their own to rebut this conclusion. Dr. Zivot repeatedly ducked the Court's questions about how long it would take for an inmate to lose consciousness under a dose of 5 grams of pentobarbital. He had apparently learned nothing since the case of Bucklew where it was noted that he engaged in a similar pattern of evasiveness when pressed on that question. He just couldn't offer a conclusion to the Court on the point. And so the Court is left with nothing but Dr. Antognini's opinion on this topic.

In addition there is no evidence that there is any variability in how pentobarbital causes death. Dr. Antognini testified that within seconds after it's administered it leads to

cardiovascular collapse and essential brain death or EEG silence, as he stated. In the brief time before that happens, the inmate would not feel pain. He did testify that in some cases, there could be mild discomfort from the actual injection of the drug, but that would be no different from the experience of having that drug injected in a clinical setting.

Ms. Pike repeatedly attempted to point to risks of IV failure, such as what would happen if pentobarbital were injected into surrounding tissue, extravasation. But she introduced no evidence that this is sure or very likely to happen. All experts agree this is a possibility. It's a possibility with any kind of injected drug. But specific to this case and this protocol, there has been no evidence to show that that is a likely outcome. Again, all we have is speculation, which is insufficient to carry her burden.

Dr. Antognini also testified extensively about the issue of pulmonary edema. He offered studies and detailed defenses of those studies to explain how pulmonary edema can develop after death. I think that it's fair to say that the experts agree that it's not 100 percent knowable

about much pulmonary edema might occur before death and how much might occur after. They both concede that some might happen before and some might happen after. But there is certainly no evidence to show that it is sure or very likely that pulmonary edema is a side effect of the dose of pentobarbital that's administered under Tennessee's protocol.

There's also been no evidence to show that it is sure or very likely that Ms. Pike's thrombocytosis will lead to pulmonary edema or that it would cause more severe pulmonary edema. Again, it was Ms. Pike's burden to come forth with scientific evidence to show that these issues are sure or very likely to happen. And she has completely failed to do that.

And so in light of these failures, the Court should find that Ms. Pike cannot prevail on any of the issues referred to by the Supreme Court. And the Court can make that ruling today. Thank you.

THE COURT: I had not anticipated this being an argument like for rebuttal, but if you want, I'll let you ...

MR. FERRELL: There's one thing that I

want to clarify for the Court that I think is pertinent to these proceedings. And that is when opposing Counsel got up and immediately started talking about the standing for a stay. And I understand that that's what our motion has been construed as in the Tennessee Supreme Court. When we began challenging what was going on with our suit in Chancery Court before we went to the Tennessee Supreme Court, we were never looking for a stay. The introduction of the amendment to Rule 12 now seems to require that you ask for a stay.

From the very beginning we were looking for a humane way to carry this out and to minimize the time that would be involved in the actual execution. And I think that that has been Ms. Pike's goal all along. And the fact that she has experienced difficult venous access that has been verified by our experts in their testimony of what they think the causes are led her to be afraid that what might happen would be stick after stick after stick that's unsuccessful followed by maybe a central line.

So we began trying to find solutions within the lethal injection process that could

make this a short and less traumatic experience. And that has been our goal all along. And the alternatives we've proposed here especially after consulting with our experts about the butterfly needle and all that is that a central line would be the quickest, least traumatic experience that she would have.

Followed by, when we began looking into it, hanging. And certainly the expert that the State presented talked about the fact that it was transection of the neck of the spinal cord and instantaneous death and would not involve the trauma of lying on a gurney surrounded by people, possibly men -- possibly all men, maybe not. We don't know. But we have been seeking that. And the only way to do that evidently under Rule 12 is to ask for a stay. And that's why we're here and that's why we're under that standard.

But I agree with Your Honor that the question is a comparison and I think that even though the State says psychological problems are not necessarily or have not necessarily been recognized by the United States Supreme Court, the State will not deny that they're very real. And in this case, they're very real and the torturous

aspect is not only very real but sure or very likely to cause tremendous and excruciating psychological distress at the moment of death.

And if this has to happen, which we certainly don't want at all -- you know, obviously we represent Ms. Pike and we don't want her to be executed. But if she is executed, it has always been her goal and our goal to avoid that trauma. And therefore we ask that this Court recognize that and the psychological trauma that would take place and find for one of our alternatives, either the central line that makes it a lot quicker. And, you know, the complications, the dangerous aspects of it -- this isn't a medical procedure to save her life. There certainly are some dangerous aspects, but the reality is that the pentobarbital would get where it needs to go and cause death in a much faster, less torturous way.

And then -- since in order to present a case to the Tennessee Supreme Court, we had to identify another alternative. Our exploration of hanging seemed to address all of those needs of it being quick, instantaneous possibly, and at worst still probably shorter than lethal injection.

For those reasons, we ask that you find

those facts necessary for the Tennessee Supreme Court to grant us relief. Thank you, Your Honor.

THE COURT: Well, I have a few observations because both of you have mentioned things that are probably beyond the scope of my duties and responsibilities here. I've got four questions now that I have to answer, and that's what I'm going to do. But after I answer those four questions, both sides are going to be arguing much of what you just talked about with the Tennessee Supreme Court. And the issue in the Tennessee Supreme Court is going to be whether or not they grant you a stay of execution so that you can pursue your collateral litigation.

In the Tennessee Supreme Court you've got to show a likelihood of success in your collateral litigation or they're not going to give you a stay. And so that's going to be the standard in the Tennessee Supreme Court. Question -- I'll pose they have to decide the likelihood of your success in your collateral litigation, but you have not filed a complaint in the Tennessee Supreme Court that tells them what your collateral litigation is. Apparently, they're going to have to make that decision from a hypothetical

complaint that might exist somewhere out there in the world of imagination.

Every Court I've ever known, if you were filing a request for a stay based upon your desire to pursue collateral litigation you would have to file a copy of the complaint so the Supreme Court could analyze whether you have a likelihood of success. Not for me to decide, but I'm mentioning this to the lawyers because that's probably going to be something that would need to be discussed down the road.

Understanding that this protocol went into effect in January of 2025 and you waited a year to file the collateral litigation challenge here. You weren't asking for a stay, but at the time you filed it, she had a death sentence set nine months later. And so unless you completed your collateral litigation in nine months you were going to eventually have to ask the Supreme Court for a stay. And even before Rule 12 was in existence, the standard required you to show the likelihood of success. So ...

Anyway, these are just issues that are beyond the realm of this Court -- this Master's -- I've never been called a Special Master and

probably never will be again. But, anyway, we're -- is that everything that everyone wants to say?

Then we're adjourned and we will wish everyone, including Ms. Pike, the best of luck in the future with anything that you pursue. And I want to thank the lawyers for their professionalism. You seem to work together and very cordially and amicably and it's been a pleasure to get to meet all of you and to work with you. We know the time schedule and the crunch is upon us. Appreciate you all working under this time pressure. And I will have a finding of fact and conclusions of law on these narrow issues.

Now of you argued things beyond the scope of these questions. I guess that will be subject to your briefing in the Tennessee Supreme Court. I won't necessarily be answering anything that's beyond the scope of these questions. I'll limit it to the questions. And I believe that the answers to these questions are all that the Supreme Court needs to make the determination. And I think they hinted in their order that if they needed more that I'd hear from them. So I don't know what to expect on that. But you'll have my findings of fact and conclusions of law next

Friday, the 21st of August.

We're adjourned.

(END OF PROCEEDINGS)

C-E-R-T-I-F-I-C-A-T-E

I, the undersigned, Karen B. Jinks, Court Reporter for the State of Tennessee, do hereby certify that the foregoing is a true, accurate and complete transcript, to the best of my knowledge and ability, of the proceedings held and evidence introduced at the hearing held in the Criminal Court for Knox County, Tennessee, in the matter of State of Tennessee vs. Christa Pike, on the 13th day of August, 2026.

I do further certify that I am neither of kin, counsel, nor interest to any party thereto.

Karen B. Jinks
Court Reporter, State of TN